SUN MUTUAL INSURANCE COMPANY *v.* OCEAN INSURANCE
COMPANY.

1. Where, in a suit in admiralty by one insurance company against another
   upon a contract of reinsurance, it became essential for the libellant to show
   that the risk which it had assumed was the same as that insured against
   by the policy sued on, and the Circuit Court asserted the identity of the
   insurances, not in the findings of fact, but as a conclusion of law, the
   question on appeal is not whether that might be true as a presumption or
   inference of fact from the circumstances stated in the findings, but whether,
   upon the facts found, it must be true as a matter of law.
2. The rule established in *United States* v. *Pugh*, 99 U. S. 265, as to findings of
   fact in cases from the Court of Claims, applies to appeals from decrees in
   admiralty, under the act of Feb. 16, 1875, c. 77.
3. It is the duty of the assured to communicate all material facts, and he cannot
   urge as an excuse for his omission to do so that they were actually known
   to the underwriters, unless the knowledge of the latter was as full and par-
   ticular as his own information.
4. The exaction of information in some instances may be greater in a case of
   reinsurance than as between the parties to an original insurance. In the
   former, the party seeking to shift the risk he has taken is bound to commu-
   nicate such information within his knowledge as would be likely to influ-
   ence the judgment of an underwriter.

APPEAL from the Circuit Court of the United States for
the Southern District of New York.

This was a libel in admiralty, filed in the District Court of
the United States for the Southern District of New York by
The Ocean Insurance Company against The Sun Mutual Insur-
ance Company, upon a policy of marine insurance. A decree
dismissing the libel was rendered in that court, which, on ap-
peal, was reversed by the Circuit Court, and a decree entered in
favor of the libellant. From that decree the present appeal
has been prosecuted.

The findings of fact made by the Circuit Court as the basis of
its conclusions of law are as follows: —

1. At the several times hereinafter mentioned the libellant
and the defendant were insurance companies engaged in the
business of insuring against losses by perils of the sea. The
libellant, to be referred to herein as The Ocean Company, was
incorporated under the laws of the State of Maine, and had its
principal place of business at Portland in that State. The

defendant, to be referred to as The Sun Company, was incorporated under the laws of the State of New York, and had its principal place of business in the city of New York.

2. On or about Jan. 19, 1864, The Sun Company issued its open policy, No. 51,564, to The Ocean Company in the usual form for the insurance of cargoes at and from Cuba to Boston or Portland; it being, however, expressly understood and agreed that no risk would be taken under it unless The Ocean Company " take or have an amount on same risk equal to one-half the amount covered by " The Sun Company. On the 9th of February, 1864, it was agreed in writing, noted upon the policy, that the policy should " cover such other risks as this (The Sun) company may approve and indorse " thereon. Under this new arrangement the clause limiting the risks to such as The Ocean Company retained an interest in to the extent named, to wit, an amount equal to one-half that of The Sun, was kept in force; but, Feb. 24, 1864, the president of The Sun Company wrote to The Ocean Company as follows: " We are willing that you be not obliged to retain a half of risk when you do not wish to do so, but we reserve the right to object to amounts returned, which it is not probable will be too great very often."

The policy issued is as follows : —

"No. 51,564.]    By The Sun Mutual Insurance Company.    [Cargo.

" The Ocean Insurance Company, on account of whom it may concern, loss payable to them, do make insurance and cause to be insured, lost or not lost, at and from Cuba to Boston or Portland, on property.

" This company not to be liable for more than fifteen thousand dollars by any one vessel at one time, unless otherwise agreed upon at the time of indorsement.

" It is understood and agreed that this company does not take any risk unless The Ocean Insurance Company take or have an amount on same risk equal to one-half the amount covered by this company upon all kinds of lawful goods and merchandise, laden or to be laden on board the good vessel or vessels          , whereof is          master for this present voyage,          , or whoever else shall go for master in the said vessel, or by whatever other name or names the said vessel, or the master thereof, is or shall be named or called

Beginning the adventure upon the said goods and merchandises from and immediately following the loading thereof on board of the said vessel at            aforesaid, and so shall continue and endure until the said goods and merchandise shall be safely landed at            aforesaid. And it shall and may be lawful for the said vessel in her voyage to proceed and sail to, touch, and stay at any ports or places if thereunto obliged by stress of weather, or other unavoidable accident, without prejudice to this insurance. T'' said goods and merchandise hereby insured are valued at

Touching the adventures and perils, which the said Sun Mutual Insurance Company is contented to bear and takes upon itself in this voyage, they are of the seas, men-of-war, fires, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints, and detainments of all kings, princes, or people, of what nation, condition, or quality soever, barratry of the masters and mariners, and of all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said goods and merchandises, or any part thereof. And in case of any loss or misfortune, it shall be lawful and necessary to and for the assured,            factors, servants, and assigns to sue, labor, and travel for, in and about the defence, safeguard, and recovery of the said goods and merchandises, or any part thereof, without prejudice to this insurance; to the charges whereof the said insurance company will contribute according to the rate and quantity of the sum herein insured, having been paid the consideration for this insurance by the assured or            assigns at and after the rate of two per cent nominal        , subject to such addition or deduction as shall make the premium conform to the established rate at the time the return is made to the company. Property on deck warranted free from claims for damage by wet, exposure, breakage, or leakage. And in case of loss, such loss to be paid within thirty days after proof of loss and proof of interest in the said        (the amount of the note given for the premium, if unpaid, being first deducted), but no partial loss or particular average shall in any case be paid, unless amounting to five per cent: Provided always, and it is hereby further agreed, that if the said assured shall have made any other assurance upon the premises aforesaid, prior in date to this policy, then the said Sun Mutual Insurance Company shall be answerable only for so much as the amount of such prior assurance may be deficient towards fully covering the premises hereby assured, and the said Sun Mutual Insurance Company shall return the premium upon so much of the sum

by them assured as they shall be by such prior assurance exonerated from. And in case of any insurance upon the said premises subsequent in date to this policy, the said Sun Mutual Insurance Company shall nevertheless be answerable for the full extent of the sum by them subscribed hereto, without right to claim contribution from such subsequent assurers, and shall accordingly be entitled to retain the premium by them received in the same manner as if no such subsequent assurance had been made. It is also agreed that the acts of the insured or insurers in recovering, saving, and preserving the property insured, in case of disaster, shall not be considered a waiver or acceptance of an abandonment. It is also agreed that the property be warranted by the assured free from any charge, damage, or loss which may arise in consequence of a seizure or detention, for or on account of any illicit or prohibited trade, or any trade in articles contraband of war.

"If laden on board a vessel of a belligerent nation, warranted free from loss or expense, arising from capture, seizure, or detention, or the consequences of any attempt thereat; or if by a neutral vessel, warranted not to abandon in case of capture, seizure, or detention, until after condemnation of the property insured, nor until ninety days after notice of said condemnation is given to the company; also, warranted not to abandon in case of blockade, and free from any expense in consequence of capture, seizure, detention, or blockade, but in the event of blockade to be at liberty to proceed to an open port, and there end the voyage; any stipulations in this policy to the contrary notwithstanding.

"In case of claims for damage on dry goods or hardware exceeding fifteen per cent, the company to have the privilege of settling upon the principle of a salvage loss, paying to the assured the sum insured, with the freight and the duties.

"In witness whereof, the president or vice-president of the said Sun Mutual Insurance Company hath hereunto subscribed his name and the sum insured, and caused the same to be attested by their secretary in New York, the sixteenth day of January, one thousand eight hundred and sixty-four.

Memorandum. — It is agreed, that bar, bundle, rod, hoop and sheet iron, wire of all kinds, tin plates, steel, madder, sumac, wickerware and willow, manufactured or otherwise, salt, grain of all kinds, tobacco, Indian meal, fruits (whether preserved or otherwise), cheese, dry fish, vegetables and roots, rags, hempen yarn, bags, cotton bagging and other articles used for bags or bagging, pleasure carriages, household furniture, skins and hides, musical

instruments, looking-glasses and all other articles that are perishable in their own nature, are warranted by the assured free from average, unless general; hemp, tobacco stems, matting and cassia, except in boxes, free from average under twenty per cent, unless general; and sugar, flax, flax-seed and bread are warranted by the assured free from average under seven per cent, unless general; and coffee in bags or bulk, pepper in bags or bulk, and rice free from average under ten per cent, unless general.

"Warranted by the assured free from damage or injury from dampness, change of flavor, or being spotted, discolored, musty or mouldy, except caused by actual contact of sea water with the articles damaged, occasioned by sea perils. In case of partial loss by sea damage to dry goods, cutlery, or other hardware, the loss shall be ascertained by a separation and sale of the portion only of the contents of the packages so damaged and not otherwise; and the same practice shall obtain as to all other merchandise as far as practicable.

"This company is not liable for leakage on molasses or other liquids, unless occasioned by stranding or collision with another vessel.

"If the voyage aforesaid shall have been begun and shall have terminated before the date of this policy, then there shall be no return of premium on account of such termination of the voyage.

"In all cases of return of premium in whole or in part, one-half per cent upon the sum insured is to be retained by the assurers.

"$100,000 (one hundred thousand dollars).

"S. WHITEHEAD, *Vice-President.*
"E. R. ANTHONY, *Secretary.*"

"1864. February 2. Additional $100,000 (one hundred thousand dollars), subject to same conditions as above.

"S. WHITEHEAD, *Vice-President.*
"E. R. ANTHONY, *Secretary.*"

Written on margin opposite additional subscription the following: —

"Warranted by the assured free from all claim for loss or damage arising from any warlike or belligerent act, or from capture, seizure, restraint, or detention by any privateer, cruiser, or armed vessel whatsoever."

3. This policy was issued with the expectation that it would be used by The Ocean Company for the purposes of reinsur-

ance, an arrangement for such a business on the part of the company having been made.

4. Dec. 24, 1863, Charles S. Pennell, as an owner and agent of the ship "C. S. Pennell," of 975 tons burthen, and then lying in the harbor of Portland, Maine, chartered the whole of the vessel, including the state-rooms in cabin not used by the officers, and deck-rooms not used for the crew or for sails and stores, to Sutton & Co., for a voyage from New York to San Francisco. No cargo was to be received on board except with the written consent of the charterers, and they were to pay " for the charter or freight " on the good and proper discharge of the cargo in San Francisco, $26,500, less two and one-half per cent commission. George M. Melcher was at the time master of the ship, and his primage on the freight money, if earned, would have been $1,325. This charter will be referred to as the San Francisco charter.

5. After the making of this charter the vessel sailed from Portland to New York, and was there put up and advertised by Sutton & Co. as a general ship for San Francisco. That firm at that time represented what was known as the Dispatch Line of San Francisco packets.

6. January 30, while the ship was in New York, loading under her San Francisco charter, and advertised for that voyage, her master chartered her again to the Peruvian government. By the terms of this charter she was to sail from New York on or before June 1, 1864, to San Francisco, and thence proceed, with all convenient dispatch, to Callao, Peru, and from thence, if on inspection she should be found to be well conditioned for the voyage, to the Chincha Islands for a cargo of guano to be taken to Hamburg or Rotterdam. The freight to be paid was at the rate of £4 per ton of 20 cwt. British net weight of guano, subject, however, to a deduction of five shillings per ton if the vessel was not ready in Callao to proceed to Chinchas by December 15. This charter will be referred to as the Rotterdam charter.

7. On the 5th of February, 1864, while the ship was in New York loading, Charles S. Pennell, a part owner, took from The Ocean Company a policy insuring his interest in the ship for $8,000 against war risks, and his interest in the Rotterdam

charter for $8,000 against marine risks on the voyage between New York and the Chinchas.   In this policy the duration and locality of the risk was described as "at and from New York, to, at, and from San Francisco, Callao, and the Chinchas."

  8. George M. Melcher was at the time owner of one-eighth of the ship, and master.   On the 20th March he wrote one Sawyer, his agent at Portland, advising that the ship was about ready to sail, and directing that insurance be effected on his interest as follows : —

| | |
|---|---:|
| War risk to San Francisco, ship | $5,000 |
| Charter to San Francisco, $26,500–⅛ | 3,300 |
| Primage on same | 1,325 |
| Homeward charter from Chinchas, insure out, say 1,750 tons, at £4 to £7,000, at currency rate of exchange, $52,400, my ⅛ | 6,550 |
| Primage on same | 2,650 |
| Chronometers, Dent, 1883; Negus, 1,261 | 500 |
| And our effects, clothing, &c. | 1,000 |
| | $19,425 |

In the same letter it was said: "I think you had better put 5 or $6,000 more marine risk in case I should lose the ship."

  9. Upon the receipt of this letter Sawyer applied to The Ocean Company for a policy upon the Rotterdam charter, primage, and personal effects to San Francisco.   In doing so, he exhibited his letter of instructions and explained fully all the circumstances.   The risk was accepted and the policy issued March 23, in which the risk was described as follows: "$6,550 on charter; $2,650 on primage; and also $1,500 on property on board ship 'Charles S. Pennell,' at and from New York to San Francisco."

  10. On the same day The Ocean Company insured the master for $3,000 on his interest in the ship during the whole of her voyage, describing the duration and locality of the risk as "at and from New York to, at, and from San Francisco and Chinchas, with usual liberties at Callao, to her port of advice and discharge in Europe."

  11. On the same 23d of March the president of The Ocean Company wrote the vice-president of The Sun as follows : —

" . . . . I also enclose returns for registry as follows : . . . . $5,000, ship ' C. S. Pennell,' to San Francisco and Chinchas, war; $5,000 fr. of do. . . . . P. S. — I also enclose an additional return for insurance on charter, primage, and property per ship ' C. S. Pennell' to San Francisco only."

The returns enclosed in this letter were as follows : —

" To the Sun Mutual Insurance Company :

" Enter on open policy of this company No. 51,564, $5,000 on charter of ship ' Charles S. Pennell' at and from New York to, at, and from San Francisco and Callao to Chinchas.

" Rate, three per cent on board.

" New York, March 23d, 1864.

" J. W., *V. P. Ocean Ins. Co.*

" Per G. A. W., *Sec'y.*"

" To the Sun Mutual Insurance Company :

" Enter on open policy of this company No. 51,564, war risk only, $5,000 on ship ' Chas. S. Pennell,' at and from New York, to, at, and from San Francisco to Callao to Chinchas.

" Rate, three per cent on board.

" New York, March 23d, 1864.

" J. W., *V. P. Ocean Ins. Co.*

" Per G. A. W., *Sec'y.*"

" To the Sun Mutual Insurance Company :

" Enter on open policy of this company No. 51,564, $6,550 on charter, $2,650 on primage, and $1,500 on property, on board ship ' Chas. S. Pennell,' at and from New York to San Francisco, including war risk.

" Rate, six per cent on board.

" New York, March 23d, 1864.

" J. W., *V. P. Ocean Ins. Co.*

" Per G. A. W., *Sec'y.*"

The first and second of these returns were for reinsurance on the risks taken for Charles S. Pennell, and the last on account of the risks taken in favor of the master on the Rotterdam charter and personal property on board, from New York to San Francisco. The risk on the vessel, taken in favor of the master at the same time, was not reported to The Sun Company.

12. Upon the receipt of this letter, with its enclosures, the

president of The Sun Company wrote The Ocean Company, under date of March 24, as follows: —

"Your favor of the 23d inst. is received, . . . and returns as stated. Those . . . on charter per 'Chas. S. Pennell,' $10,700, in conformity thereto. For the marine risk per 'Chas. S. Pennell' to San Francisco, thence to Callao & Chinchas, our regular tariff rate is four and one-half per cent; the war risk is worth the same but we propose to enter for both marine and war on $5,000 for four per cent."

13. To this the president of The Ocean Company replied, under date March 26, as follows: —

"Your favor of the 24th inst. is received. I think, really, considering that you have the risk on charter, primage, and property to San Francisco at full rates, you should take the war and marine to San Francisco and Chinchas on 'C. S. Pennell' at six per cent, as there is or will be but little risk in the Pacific after leaving San Francisco. I can have both risks taken at less than these rates."

14. In response to this the vice-president of The Sun wrote, under date of March 28, as follows: —

"Your favor of the 26th inst. is received with a return, . . . which is entered in conformity thereto, as have also been the returns of the 23d inst., per ship 'C. S. Pennell.'"

15. The indorsement of these returns upon the open policy was as follows: —

| 1864. | Vessel. | From — | To — |
|---|---|---|---|
| March 23. | Ship Chas. S. Pennell | N. Y., San Francisco | Callao & Chincha |

| | Am'ts. | Rates. | Prems. |
|---|---|---|---|
| On charter | $5,000 | 3 | $150 marine |

| 1864. | Vessel. | From — | To — |
|---|---|---|---|
| March 23. | Ship Chas. S. Pennell | N. Y., San Francisco | Callao & Chinchas |

| | Am'ts. | Rate. | Prems. |
|---|---|---|---|
| On vessel | $5,000 | 3 | $150 war only |
| " " " | New York, San Francisco, charter, 6,550; 6,393 | | war & marine |
| " " " " | " primage, 2,650; 6,159 | | " |
| " " " " | " property, 1,500; 6, 90 | | " |

16. At the time these returns were made and accepted The Sun Company had actual knowledge of the San Francisco charter, and had taken risks on cargo shipped on board the vessel to San Francisco under it.

17. When the returns were made by The Ocean Company to The Sun for acceptance and indorsement, no special mention was made of the Rotterdam charter, and no information was given The Sun Company of what had transpired between The Ocean Company and the agent of the master when the insurance was effected. No allusion was made to the letter of the master to his agent, which was shown the president of The Ocean in connection with the application to that company, and The Sun Company had no other knowledge of the existence of the Rotterdam charter than such as is to be inferred from the correspondence which preceded the acceptance of the risk.

18. Both the president of The Ocean Company and the vice-president of The Sun Company are dead. The first-named died in July, 1869, and the last some time before Jan. 1, 1867.

19. The ship sailed from New York to San Francisco about the 1st of April, 1864, having on board a full cargo under the San Francisco charter. Having met with a disaster on the voyage, she put into Rio Janeiro, where she was condemned and sold, and the voyage broken up.

20. The loss under the risk taken in favor of Charles S. Pennell, both on the ship and Rotterdam charter, was paid by The Sun Company without objection, Oct. 23, 1865, and May 5, 1866.

21. In due time after the loss occurred, the master filed with The Ocean Company his proofs under his policy on account of the Rotterdam charter and his primage thereon. These proofs were promptly forwarded by The Ocean Company to The Sun, and no objections to their form were ever made. Payment was refused by The Sun Company on the ground that the master was over insured, and also upon the ground that the ship had been fraudulently cast away, and The Ocean Company was advised not to pay the claim on that account.

22. Pursuant to this advice, payment was refused by The Ocean Company, and, in October, 1866, Melcher, the master, commenced suit upon his policy in the courts of Maine.

23. Of the commencement of this suit notice was immediately given The Sun Company by The Ocean Company, and The Sun Company interested itself in the preparation for de-

fence.  An agent of those interested, including another company having a risk upon the voyage, was sent to Rio Janeiro to ascertain the facts in relation to the loss, and report.  In the mean time the suit upon the policy was suffered to remain in the court without being pressed.  At the October Term, 1869, the counsel for the plaintiff insisting that something should be done, it was agreed, on behalf of The Ocean Company, that the case should, if possible, be tried at the January Term, 1870.  In November, or late in October, 1869, the counsel on the part of The Ocean Company visited New York for the purpose of having a personal interview in respect to the case with the officers of The Sun Company.  He there met the then vice-president of the company.  At the interview which then took place, the points of defence that had been previously suggested by the companies having been discussed, the counsel stated that, in his opinion, they could not be sustained by the evidence, but that he intended to make the point that the Rotterdam charter was not included in the risk as described in the policy.  He said, however, that he had been informed by the attorneys who conducted the case for the plaintiff they had extrinsic evidence which would establish the liability and which they expected to introduce.  This extrinsic evidence he considered inadmissible, but at the same time said that if admitted, the defence to the action would undoubtedly fail.  He then informed The Sun Company that upon the presentation of the evidence on the trial he should object to its admission, and he had no doubt the presiding judge, under the practice of that State, would take the advice of the Supreme Court upon that question before proceeding further.  If the evidence was ruled out, he expected to succeed in his defence ; but if admitted, he had little hopes.  He did not at that time know precisely what the testimony would be, and he did not communicate to the company the particular fact relied upon.

24.  At the conclusion of the interview he was instructed by the vice-president of The Sun Company to go forward with the defence, and make every point possible.  He was paid at the time one hundred dollars, for which he gave a receipt as follows : —

"New York, Nov. 2d, 1869.

"Received from The Sun Mutual Insurance Company one hundred dollars, on account of legal expenses and services for defending The Ocean Insurance Company of Portland from claims for loss on charter and primage in case of the ship 'C. S. Pennell,' reinsured by The Sun Mutual Insurance Company for The Ocean Insurance Company.

"JOHN RAND."

25. At the April Term, 1870, the cause came on for trial, and the questions were raised upon the admissibility of the extrinsic evidence, and reported to the Supreme Court for its opinion. The testimony objected to included the deposition of Sawyer, the agent of the insured, as to what transpired between him and The Ocean Company at the time the insurance was effected; the letter from the insured to Sawyer specifying the risk to be taken, and which was submitted to the company by the agent, as showing the authority under which he acted, and also the Rotterdam charter.

26. On the 6th of October, 1870, the attorney of The Ocean Company sent The Sun Company a copy of the case thus made, which contained a statement of the evidence offered and objected to.

In the letter transmitting this document, the attorney said:—

"The question now presented to our court is simply whether he (the insured) shall be allowed to put in the testimony. If not allowed, there is an end of the case. If allowed, then we go to trial upon other points of defence."

26½. In reply to this the president of The Sun Company wrote as follows:—

"New York, Oct. 15, 1870.

"Messrs. J. & E. M. RAND, Portland, Me.

"GENTS,— Yours of 6th instant was duly received, also the printed documents which you sent, and which we have perused carefully.

"It is shown by the testimony that the policy was made in accordance with the application of the plaintiff, and that there was no misunderstanding in relation thereto calling for the admission of

evidence outside of the policy to explain it ; certainly none would be admissible to contradict it, for that would be setting up a new contract other than the policy itself which is sued upon.

"It is important, therefore, to have excluded all evidence tending to contradict the policy. By the policy, as made, the plaintiff insured on charter New York to San Francisco, $6,550; on primage, $2,650; on personal effects, $1,500. There is no such charter shown ; but the plaintiff sets up a charter to San Francisco and ports beyond, as described in the charter-party. The insurance of the charter to San Francisco was an insurance of only a part of said charter, not amounting even to a part insurance of the charter, because as the charter-party is to the effect that no money is to be paid by the charterers unless the whole round voyage is performed, and the contract being indivisible if no money was to be paid for the passage to San Francisco, the plaintiff had no insurable interest in that part of the charter ; besides, the ship was loaded to her full capacity, and was carrying full freight on said passage outside of the charter, which was covered under special policies. The plaintiff has, therefore, by the perils insured against in the policy, suffered no loss beyond what he has already been indemnified for under his policy on freight. The interest of the plaintiff in the passage to San Francisco was, therefore, an impossible interest. I do not mean to say that he had no interest in the charter-party, but the risk under our policy being only to San Francisco, ended before the charter-party could by any possibility be performed. I think, therefore, that the main question is the question of interest, and think that the above reasons will be found sound in law. Please let me hear from you as to your opinion of them, and also as to your line of defence, — what your points are, — in order that I may be able to form some opinion as to the ultimate issue of the suit.

"Yours respectfully,
"(Signed)    J. P. PAULISON, *President*."

27. In or about January, 1872, the Supreme Court decided that the testimony was admissible, and on the 16th of that month the attorneys advised The Sun Company of the result, and sent a copy of the opinion delivered. They also said that the case would probably come up again for hearing in a week or two, and asked that papers of any kind relating to the defence in the possession of The Sun Company might be forwarded to them at once.

28. Upon the receipt of this last letter the case was submitted by The Sun Company to its counsel in New York, who gave his opinion in writing to the effect "that The Sun Mutual Insurance Company's liability under the reinsurance policy cannot be extended beyond the obvious import of the terms in which it is expressed. The letter of Melcher ordering the insurance not having been exhibited to them, nor the explanations of Sawyer made to them, they cannot be affected by them; and hence, if the admission of extrinsic evidence as to what took place between Sawyer and The Ocean Company, when the original insurance was made, varies the case as between that company and Melcher from what it appears to be on the face of the original policy, I cannot see that it is a matter that concerns The Sun Company."

29. January 29 a copy of this opinion was forwarded by The Sun Company to the attorneys in Portland, and attention called to its contents.

30. At the January Term, 1872, the cause was again tried, and the testimony being all in, the case was withdrawn from the jury and submitted to the court to enter such judgment as law and the evidence required. The point was directly made by The Ocean Company that the policy never attached, because the ship never actually or legally sailed under the Rotterdam charter.

31. On the 12th of July, 1872, the case having been printed, a copy was sent by the attorneys in Portland to The Sun Company, with a statement that the cause would come on for argument before the full bench in a few days. Permission was also asked to draw on the company at sight for $500 on account of fees and disbursements.

31½. On the 5th of July The Sun Company replied, denying its liability to pay fees, and saying that, "as the suit is against The Ocean Company and not against us, you must look to them for your fees." It is also said in the letter that when the payment of $100 was made, in November, 1869, the case as subsequently developed was not fully understood.

32. A judgment was afterwards rendered in the suit against The Ocean Company for $9,200, and interest from April 27, 1865.

33. This judgment was satisfied by payments of The Ocean Company as follows : —

July 19, 1873 . . . . . . . . . . . $4,234 29
July 21, 1873 . . . . . . . . . . . 10,086 55

34. The costs in the action which were included in the payment were $574.17.

35. The account of the counsel in the cause for their professional services and disbursements, over and above the $100 paid by The Sun Company, was $1,164.70. This was also paid by The Ocean Company, July 23, 1873, and was reasonable.

36. Payment of the amount of the judgment and the account for counsel fees, was duly demanded of The Sun Company before the commencement of this suit, and refused.

The following is the statement by the Circuit Court of its conclusions of law : —

1. The Sun Company's policy covers the Rotterdam charter.

2. The policy is not void because of any concealment by The Ocean Company.

3. The judgment in the Maine court against The Ocean Company is conclusive upon the issues there made and decided, and binds The Sun.

4. This action is not barred either by the Statute of Limitations or by lapse of time.

5. The Sun Company is bound in law to reimburse The Ocean for moneys expended on account of counsel fees, and the costs and expenses in defending the suit in the Maine court.

6. The libellant is entitled to a decree against the defendant for —

1. Amount paid in satisfaction of the Maine judgment . $14,320 84
2. Amount paid for counsel fees, expenses, &c. . . . 1,164 70

In all . . . . . . . . . . . . . . . $15,485 54

With interest from July 21, 1873, and the costs in both courts.

*Mr. William M. Evarts* and *Mr. Joseph H. Choate* for the appellant.

*Mr. E. N. Taft* and *Mr. Robert D. Benedict* for the appellee.

MR. JUSTICE MATTHEWS delivered the opinion of the court, and, after making the above statement, proceeded as follows : —

By the express terms of the act of Congress of Feb. 16, 1875, c. 77, defining the jurisdiction of this court, in cases such as the present, we are limited to a determination of the questions of law arising upon the record, including the rulings of the Circuit Court, presented in a bill of exceptions. And, as was decided in *The Abbotsford*, 98 U. S. 440, and substantially repeated several times since, " the facts as found and stated by the court below are conclusive. The case stands here precisely as though they had been found by the verdict of a jury." *The Benefactor*, 102 id. 214; *The Adriatic*, 103 id. 730 ; *The Annie Lindsley*, 104 id. 185 ; *The Francis Wright*, 105 id. 381. Or as it was put in *The Annie Lindsley*, 104 id. 185, 188 : " The question, and the only question, which we can consider is, whether the facts found support the conclusions of law and the decree." The findings of fact being in the nature of a special verdict, we can go neither behind nor beyond them. We cannot correct them by inquiring into the evidence, nor supply any omissions by intendment or inference. The rule applicable to special verdicts was stated in *Collins* v. *Riley*, 104 id. 322, 327, — " that the special verdict must contain all the facts from which the law is to arise ; that whatever is not found therein is, for the purposes of a decision, to be considered as not existing ; that it must present, in substance, the whole matter upon which the court is asked to determine the legal rights of the parties, and cannot, therefore, be aided by intendment or by extrinsic facts, although such facts may appear elsewhere in the record," — which needs qualification in its application to such cases as the present ; for our jurisdiction, in cases of this description, extending to a determination of the questions of law arising upon the record, may be predicated of facts which appear in any part of it, whether admitted by the

parties · in the pleadings, or by stipulation, or found by the court. But it is essential that the findings of fact should state the facts, and not the evidence merely, even although the evidence be sufficient to establish the fact. Mr. Chief Justice Marshall stated this rule in *Barnes* v. *Williams*, 11 Wheat. 415, when he said : " Although, in the opinion of the court, there was sufficient evidence in the special verdict from which the jury might have found the fact, yet they have not found it, and the court could not, upon a special verdict, intend it. The special verdict was defective in stating the evidence of the fact, instead of the fact itself. It was impossible, therefore, that a judgment could be pronounced for the plaintiff." This was approved in *Hodges* v. *Easton,* 106 U. S. 408. And see *Prentice* v. *Zane's Adm'r*, 8 How. 470, and *Norris* v. *Jackson*, 9 Wall. 125.

These observations have a material and important application in this case.

It was essential to the establishment of the libellant's right of recovery to show that the risk insured against by the policy sued on was the same which the libellant was adjudged liable for on its policy to Melcher. The policy of the respondent in this suit, although, in substance, a reinsurance, was not so in form. It did not describe the risk by reference to the policy of The Ocean Company, so that the identity between the two could be ascertained by mere comparison. It did not, in fact, allude to any such policy. The risk is described, solely, by words descriptive of the property insured, without a definition of the interest of the assured. It became necessary, therefore, to aver the identity of the two insurances. This the libel does. But, as it is denied in the answer, it became necessary to prove it. The finding of facts, however, in the Circuit Court does not assert it. It contains other facts bearing on the question. But the conclusion itself is stated, not as a fact, but as a conclusion of law, from the facts found, — the facts and the conclusions of law having been separately stated, as expressly required by the act of Congress. The first conclusion of law, in the statement made by the Circuit Court, is that " The Sun Company's policy covers the Rotterdam charter."

The question, therefore, presented to us on this appeal is,

not whether that might be true as a conclusion of fact from the circumstances stated in the findings of fact, but whether, upon the facts found, it must be true as matter of law.

The distinction is obvious and important. The circumstances in evidence might be such, that a jury, or a court sitting to try the case without a jury, would believe, as the more reasonable probability, according to the ordinary and observed course of human conduct, that the fact disputed had or had not actually taken place; and in that case the inference would be one of fact. On the other hand, the facts found might be such as to be, in point of law, inconsistent with any supposition, except that of the existence or non-existence of the fact in controversy, in which case the conclusion is necessary, independently of any belief based upon what is more or less probable, because the law declares the uniform effect of such a state and condition of circumstances. The difference is between presumptions of fact and rebuttable presumptions of law, or *presumptiones juris tantum*, as distinguished from *presumptiones juris et de jure*, according to the classification of Best, Law of Evidence, sect. 314, 4th English ed., who states the practical test for distinguishing them thus: "Where a presumption of law is disregarded by a jury, a new trial will be granted *ex debito justitiæ;* but where the presumption disregarded is only one of fact, however strong or obvious, the granting a new trial is at the discretion of the court *in banc.*" Sect. 323.

In other words, when the testimony has been sifted and weighed, and the actual circumstances of the transaction stated in a connected form, the law, by means of its presumptions, determines whether they establish such a relation between the parties as to give rise to reciprocal rights and obligations, and if so, what legal consequences have followed. The issue to be determined may be one, in form, merely of fact, as whether a particular contract was made, or whether one or both of the parties have been guilty of negligence. The circumstances of the entire transaction having been ascertained and stated, the issue is determined by the interpretation which the law puts upon them. This is an office quite distinct from ascertaining the circumstances themselves by the process of reduction from

the original mass of evidence. It involves only a consideration of the facts as found, in their relation to each other, in view of fixed legal presumptions, in order to determine and declare the effect to be given to them as a connected whole.

This rule was, after much consideration, established in *United States* v. *Pugh*, 99 U. S. 265, in reference to the examination of the judgments of the Court of Claims, and we reiterate it here, as equally applicable to appeals from the decrees in admiralty of the Circuit Courts of the United States under the act of 1875. In that case, one of the issues to be determined was, whether the proceeds of the sale of the captured property belonging to the claimant had been paid into the treasury. No direct proof to that effect had been given, but if shown at all, it was by way of inference from certain circumstantial facts established by the evidence, and set forth in the finding of the court below. The Chief Justice said, upon this point: " Confessedly, the court has found all the facts which have been directly established by the evidence. These facts are not evidence in the sense that evidence means the statements of witnesses or documents produced in court for inspection. They are the results of evidence, and whether they establish the ultimate fact to be reached is, if a question of fact at all, to say the least, in the nature of a question of law. If what has been found is, in the absence of anything to the contrary, the legal equivalent of a direct finding that the proceeds of this claimant's property have been paid into the treasury, the judgment is right; otherwise, it is wrong. The inquiry thus presented is as to the legal effect of facts proved, not of the evidence given to make the proof," &c. . . . " The rule relieves us from the necessity of considering the evidence at all, and confines our attention to the legal effect upon the rights of the parties of the facts proven as they have been sent up from the court below. In this way the weight of the evidence is left for the sole consideration of the court below, but the ultimate effect of the facts, which the direct evidence has established, is left open for review here on appeal."

Tried according to this standard, we are quite clear that the conclusion under examination cannot be sustained.

The facts material to the point, and which, in our opinion, justify and require this result, are as follows : —

The language of the policy sued on, descriptive of the risk assumed, is, " $6,550 on charter, $2,650 on primage, and $1,500 on property on board ship ' C. S. Pennell,' at and from New York to San Francisco." The proposal for this insurance was made March 23, 1864, by letter. The vessel, at that time lying at New York, had been previously chartered to her full capacity for a voyage from New York to San Francisco, of which both companies had knowledge ; and on Jan. 30, 1864, was chartered by Melcher, her master, to the Peruvian government, by the terms of which charter she was to sail from New York on or before June 1, 1864, to San Francisco, and thence proceed, with all convenient dispatch, to Callao, Peru, and from thence, if on inspection she should be found well conditioned for the voyage, to the Chincha Islands for a cargo of guano to be taken to Hamburg or Rotterdam. Of this second charter The Ocean Company had full knowledge, having, on Feb. 5, 1864, insured to Pennell, a part owner, his interest in both the ship and this charter on the voyage described as " at and from New York to, at, and from San Francisco, Callao, and the Chinchas." And on March 20, 1864, Melcher, one-eighth owner and master, by letter to his agent, Sawyer, directed the latter to insure his interest in the ship and both charters, specifically describing them, and primage and personal effects on board. Sawyer, exhibiting this letter to The Ocean Company and explaining fully the circumstances, that company issued one policy to Melcher, describing the risk in the same words as those used in the policy sued ; and by a separate policy insured $3,000 on his interest in the ship during the whole voyage, described as " at and from New York to, at, and from San Francisco and Chinchas, with usual liberties at Callao, to her port of advice and discharge in Europe."

The letter of March 23, 1864, from The Ocean Company to The Sun Company, containing the return of the insurance involved in this suit, included two others, both of which were accepted, one of $5,000 " on charter of ship ' Charles S. Pennell ' at and from New York to, at, and from San Francisco and Callao to Chinchas ; " the other, a war risk only of $5,000

on the ship, on voyage described in the same words.   The correspondence between the companies on the subject, at the time these risks were assumed, undoubtedly contains a reference to a voyage from New York to San Francisco, and thence to Callao and Chinchas, and of two insurances on charter, in one of which the voyage is described as including New York and Chinchas *via* San Francisco and Callao, and in the other, from New York to San Francisco; but there is nothing which indicates with any conclusive force that there were two distinct charters, and certainly nothing to indicate that there was one which included the return voyage from the Chinchas to Rotterdam.   And in respect to the latter, it is found, as a fact, that "The Sun Company had no other knowledge of the existence of the Rotterdam charter than such as is to be inferred from the correspondence," which, as we have just stated, and as must appear from the full text of the letters set out in the findings, communicated no knowledge of such a charter whatever.

It will not suffice to say, as was said in argument, that the language of the correspondence and of the three contemporaneous insurances was such as to give The Sun Company notice of a voyage and charter beyond San Francisco, as well as of one to that port from New York, and that they must include distinct interests, so that, upon inquiry, it might have become informed of all the particulars of the Rotterdam charters.   For the question is not one of notice sufficient to suggest further inquiry, and of due diligence in prosecuting it, disregard of which may be alleged as laches, but whether the minds of the parties in fact met in a common understanding, so as to consummate the contract sued on.   And to show that, it was necessary to prove, in the absence of express words, and to resolve the ambiguity arising upon the evidence, that, from the circumstances, in point of fact, The Sun Company must have intended to insure an interest in the Rotterdam charter. Proof of its actual knowledge that such a charter was in existence would be only one step in that direction, and even that is wanting.   Had it been supplied, the burden of proof would have still remained with the libellant to show that it was meant by both parties to describe that particular risk,

under an insurance upon a charter during a voyage described as at and from New York to San Francisco.

It is admitted that the language of the policy does not of itself import an insurance of a charter beyond one during the voyage described. *Prima facie*, indeed, it describes a charter terminating with that voyage, and not beyond. In the action brought by Melcher against The Ocean Company in Maine, and determined in the Supreme Court of that State, it was claimed by the defendant that the language of the policy conclusively described a charter-party limited to the description of the voyage, and that proof was not admissible to show that any other existed and was the one meant. And it was held in that case, in substance, that without such proof there could be no recovery; but that, inasmuch as a description of the voyage during which the risk was insured did not necessarily determine the extent of the charter-party under which the freight was to be earned, it appearing from extrinsic evidence that two charter-parties existed to which the insurance might apply, a latent ambiguity was disclosed which was susceptible of explanation by parol evidence. And accordingly, upon proof of the communications between Melcher and The Ocean Company, not made known at any time to The Sun Company, the former was adjudged to have insured by its policy his interest in the Rotterdam charter. Without that proof he must have failed in his litigation. It cannot be claimed that such proof is admissible to explain the contract of the appellant.

Nor is the liability of the latter affected by the fact that its policy is one of reinsurance in fact; nor by the circumstance that it aided in the maintenance of the defence in the suit against The Ocean Company; nor by the result and judgment in that action.

The policy, although a reinsurance, is a contract, which, like others, must be construed according to its terms, and the same ambiguity arises in respect to it that was found to exist in respect to the original insurance. The Sun Company, in maintaining the defence in aid of The Ocean Company, that the policy of the latter did not cover an insurance of Melcher's interest in the Rotterdam charter, maintained also, what it has continued to do in this suit, its own defence against the

changed claim of The Ocean Company which the latter now asserts, with the advantage that its defence cannot be overcome by proof of explanations outside of the policy itself, such as defeated the libellant in its contest with Melcher. And the judgment rendered in favor of the latter, upon the point in question, as to what was in fact the contract made with him by The Ocean Company, is no adjudication against the appellant, as to what is the contract between the parties to this suit; for it is only upon the pre-supposition of the identity of the subject-matter of the two contracts that it could be pretended that the judgment against The Ocean Company would be admissible in evidence, for any purpose material here, against The Sun Company. To admit it as evidence of that identity is a pure *petitio principii.* Accordingly, it was an additional and substantive error in the Circuit Court to find, as a conclusion of law, as it did, that "the judgment in the Maine court against The Ocean Company is conclusive upon the issues there made, and decided and binds The Sun." It was, of course, conclusive upon The Ocean Company, but was not even admissible in evidence against The Sun Company, without prior proof that the policy of the latter company was intended to cover the Rotterdam charter.

Much reliance is placed, in argument in support of this contention on the part of the libellant, upon the circumstance, stated in the findings of fact, that "the loss under the risk taken in favor of Charles S. Pennell, both on the ship and Rotterdam charter, was paid by the Sun Company, without objection, October 23, 1865, and May 5, 1866." These losses were paid on the two insurances effected contemporaneously with that sued on in this proceeding, in which the voyage described was, "at and from New York to, at, and from San Francisco and (to) Callao to Chinchas." But, at most, this only gives rise to an inference that these two insurances were intended to cover some charter, other than the one from New York to San Francisco, and, indeed, is not conclusive as to that. It certainly does not establish, even in respect to them, that they were understood, at the time the insurances were effected, to cover a risk upon an interest in the Rotterdam charter, or any charter in force during the voyage from New

York to San Francisco; much less, can it be said, that any admission can be implied, from such payment, that the risk, described as upon ship and charter during the extended voyage to Callao and the Chinchas, although described as commencing at New York, was identical, so far as the charter was concerned, with that in the policy sued on, in which the voyage is described as from New York to San Francisco. In any aspect, the circumstance relied on is merely argumentative. The Sun Company may have made the payment inadvertently, without consideration of its strict rights. It certainly is not conclusive as an admission of liability in this case, for it has no element of estoppel, and to justify the conclusion of law sought to be drawn from it would be to give it that effect.

The fact that The Sun Company participated in the defence of The Ocean Company in the action brought by Melcher, and the communications between the companies in respect to it, so far as they are set out in the findings of fact, are, in our opinion, equally without effect, and do not amount either to an admission of liability or to an agreement to be bound by the result of that litigation; and having carefully considered all the circumstances found and relied on, without further special mention of them, we are constrained to say that they do not, either singly or together, sustain the conclusion that "The Sun Company's policy covers the Rotterdam charter."

This conclusion is, in our opinion, greatly strengthened by the consideration of other facts set out in the finding, which, while they tend to show that as a matter of fact The Sun Company did not intend to reinsure Melcher's interest in the Rotterdam charter, furnish also a distinct ground of defence, as matter of law, if the fact had been otherwise, and negative the second conclusion of law announced by the Circuit Court, that "the policy is not void because of any concealment by The Ocean Company."

The situation was this: There were two concurrent charters on the ship, both which were treated as in force during the one voyage from New York to San Francisco, in the course of which she was lost. The first charter covered a full cargo, and no additional freight could be simultaneously earned under the second, for no part of the cargo contemplated by it could

be on board till after the voyage under the first charter had been completed. In case of loss during that voyage, consequently, there could be no salvage of freight applicable to the second charter. Melcher was master and owner of one-eighth of the ship. On March 20, 1864, he instructed his agent, Sawyer, by letter shown to The Ocean Company, to effect insurance on his behalf against war risk on ship, and generally on his interest in both charters specifically, besides primage, and on his personal effects, amounting in all to $19,425, and in the same letter said: "I think you had better put $5,000 or $6,000 more marine risk in case I should lose the ship." The Ocean Company accepted the risk on the Rotterdam charter, primage, and personal effects to San Francisco, and on the same day insured the master for $3,000 on his interest in the ship during the whole of her voyage, describing the duration and locality of the risk as "at and from New York to, at, and from San Francisco and Chinchas, with usual liberties at Callao, to her port of advice and discharge in Europe." This latter insurance was not made known to The Sun Company, nor was it informed of any of the communications that had taken place between The Ocean Company and Melcher, including the contents of the letter to Sawyer.

It thus appears that at the time of the loss Melcher had insurance on two concurrent charters and his primage thereon during one voyage, being insured, besides his interest in the ship, on double the amount of its possible earnings of freight for one voyage. This fact was known to The Ocean Company at the time, and was not communicated by it to The Sun Company, which was without other knowledge upon the subject, and executed its policy to The Ocean Company in ignorance of it.

That knowledge of the circumstance was material and important to the underwriter as likely to influence his judgment in accepting the risk, we think, is so manifest to common reason as to need no proof of usage or opinion among those engaged in the business. It was a flagrant case of over-insurance upon its face, and made it the pecuniary interest of the master in charge of the ship to forego and neglect the duty which he owed to all interested in her safety. Had it been known, it is

reasonable to believe that a prudent underwriter would not have accepted the proposal as made, and, where the fact of the contract is in dispute, as here, corroborates the denial of the appellants. The concealment, whether intentional or inadvertent, we have no hesitation in saying, avoids the policy, if actually intended to cover the risk for which the claim is made.

In respect to the duty of disclosing all material facts, the case of reinsurance does not differ from that of an original insurance. The obligation in both cases is one *uberrimæ fidei*. The duty of communication, indeed, is independent of the intention, and is violated by the fact of concealment even where there is no design to deceive. The exaction of information in some instances may be greater in a case of reinsurance than as between the parties to an original insurance. In the former, the party seeking to shift the risk he has taken is bound to communicate his knowledge of the character of the original insured, where such information would be likely to influence the judgment of an underwriter; while in the latter the party, in the language of Bronson, J., in the case of the *New York Bowery Fire Ins. Co.* v. *New York Fire Ins. Co.*, 17 Wend. (N. Y.) 359, 367, is " not bound nor could it be expected, that he should speak evil of himself."

Mr. Duer (Lect. 13, pt. 1, sect. 13 ; 2 Ins. 398) states as a part of the rule the following proposition : —

" Sect. 13. The assured will not be allowed to protect himself against the charge of an undue concealment by evidence that he had disclosed to the underwriters, in *general* terms, the information that he possessed. Where his own information is specific, it must be communicated in the terms in which it was received. General terms may include the truth, but may fail to convey it with its proper force and in all its extent. Nor will the assured be permitted to urge, as an excuse for his omission to communicate material facts, that they were actually known to the underwriters, unless it appears that their knowledge was as particular and full as his own information. It is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging of the value of the risks; and when any circumstance is withheld, however slight and immaterial

it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance; the concealment vitiates the policy."

This statement is sustained by the authorities cited, — *Ely* v. *Hallett,* 2 Caines (N. Y.), 57 ; *Moses* v. *Delaware Ins. Co.,* 1 Wash. 385, — and, in our opinion, is a necessary deduction from the nature and spirit of the contract of insurance. It applies with peculiar force in the present case, as every sentence of the rule is a condemnation of The Ocean Insurance Company in imposing upon the appellant the whole risk of the insurance, without communicating its knowledge of the circumstances, which might have made the latter as unwilling to assume it as they seem to have made the former unwilling to retain even a share of it.

For these reasons, and without passing upon other questions discussed, the decree of the Circuit Court will be reversed, and the cause remanded with directions to enter a decree dismissing the libel ; and it is

*So ordered.*


MR. JUSTICE MILLER, with whom concurred MR. CHIEF JUSTICE WAITE and MR. JUSTICE BRADLEY, dissenting.

I do not concur in the opinion of the court. It proceeds, as I think, upon an erroneous view of the principles of reinsurance, and places the reinsurer in the exact condition of a joint insurer, or of an original insurer of the risk of the party first insured.

In point of fact, The Sun Company insured The Ocean Company against the risk which the latter had incurred by its policies, and unless there was misrepresentation, fraud, or intentional concealment by The Ocean Company, The Sun Company should pay the loss which the other sustained, and against the hazard of which it agreed to insure The Ocean Company.

The long course of dealing between the two companies showed that The Sun Company was in the habit of reinsuring for The Ocean Company without inquiry into the particulars of the risk, and in this case there was no reason for any special communication of the circumstances of the risk by The Ocean to The Sun Company.