LEATHEM SMITH–PUTNAM NAV. CO. et al. v. NATIONAL UNION FIRE INS. CO. et al.

No. 6416.

Circuit Court of Appeals, Seventh Circuit.

May 19, 1938.

Thomas A. Sanderson, of Sturgeon Bay, Wis., and 'Robert Branand, Jr., of Chicago, Ill., for appellants.

T. Catesby Jones and W. J. Nunnally, Jr., both of New York City, Rowland W. Stebbins, of Milwaukee, Wis., and John H. S. Lee, of Chicago, Ill., for appellees.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Libelants appeal from a decree dismissing their libel. They are the owner and mortgage-trustees of the freighter Material Service which sank in Lake Michigan, just before entering Calumet Harbor, shortly after 1 a. m., July 29, 1936. Respondents are ten underwriters of two insurance policies for more than $200,000.

The basis of the District Court's decree was the finding that the vessel was unseaworthy, because, of 48 8-inch holes in its hatch leaves, 12 were not provided with

covers having adequate, workable, locking devices to prevent entry of water from the deck.

The ship was built by libelant, Smith-Putnam Company, in 1929. It was used principally to carry gravel from Lockport, Ill., to South Chicago, by way of the Canal, the Chicago river and Lake Michigan. Its owner decided to modify the boat to adapt it to "sand-sucking" in the lake, and from this alteration came about the changes alleged to have caused unseaworthiness. The changes were effected in April and early May, 1936, and so far as here material, consisted in cutting, by acetylene torch, 48 8-inch holes in 12 hatch covers, and installing heavy flumes which emptied into the holes.

The circular pieces cut from the holes were converted into lids by the addition of 4 half-oval lugs, 1" x 2" on the upper surface, and the welding of two small circular lugs on the bottom of the lid. The function of the lower lugs was to lock the lid in place by rotating it after the lugs were dropped through corresponding notches in the hatch leaf. The lid and lugs, and the hatch leaf opening, might be roughly illustrated as follows:

libelants replied that they would complete the installation within 10 days and at that time furnish blue prints to enable the Bureau to revise its calculation as to stability. On April 18, 1936, the Bureau wrote the local inspectors observing that blue prints were to be furnished and saying that upon receipt of the same they would be further advised with regard to stability of the vessel. The blue prints were furnished May 7, 1936, but contained no showing of the holes already cut.

Inspector Patterson visited the ship again on June 15, 1936, to check up on the holes. Then, for the first time, he saw them. He requested a sketch that could be submitted to Washington, on the theory that cutting the holes might affect the safety of the vessel. Patterson reported his inspection in writing, saying that circular holes about 8 inches in diameter had been cut in the hatch covers about 5½ feet apart; that special circular covers had been made to fit into them, so arranged with lugs that they would properly close the holes and be secured. At that time, however, a number of holes had not been slotted to provide means for locking, and this condition persisted at all times there-

The evidence disclosed, and the court found, that 12 of these 48 lids were without the 2 locking lugs. In cutting the holes some burrs resulted on the under side of the hatch leaf, thereby, it is claimed, producing an uneven surface which prevented, in some cases, rotation of the under lugs of the lid and proper locking thereof.

On March 31, 1936, Mr. Patterson, assistant inspector of hulls in the Chicago office of the United States Local Inspectors made an annual inspection of the boat. He found work being done on the new flumes on the deck, raised a question as to how sand would be put into the cargo, and was told of the plan in mind. On April 2, 1936, the Chicago inspectors wrote libelants requesting blue prints or sketches showing the location and weight of all apparatus being installed. On April 9, 1936,

after. Furthermore some of the covers had no lugs for locking. The court found, justifiably, that 12 of the holes were without slots or notches and that it was impossible to fit any cover on any of these holes so that it could be held in place in any way other than by its own weight.

The local inspectors requested of the libelants details of the modification work, and, in the latter part of June, libelants wrote to the inspectors saying that, in accordance with the latter's request, they were enclosing a sketch showing what had been done. This report contained these words: "You will note these covers are arranged to lock by turning through ⅛ turn after dropping in place, so they cannot wash up or work loose. These covers in no way interfere with the present hatch arrangement which remains unchanged." The fair implication is that if

they were not so locked, they would "wash up" or "work loose."

The Bureau of Marine Inspection and Navigation, upon receipt of this application, granted permission to cut 8-inch holes in the hatch covers spaced "not closer than 6 feet apart, provided tarpaulins secured to the hatch and instantly available may be rolled down to cover these holes should a squall come up suddenly." It is not disputed that the holes were less than 6 feet apart; that they were burred and irregular, and that 12 of the covers and holes were not so constructed as to make locking possible.

The writing of the insurance policies was based largely upon the report of one Walker, a surveyor, whose report the insurance companies agreed to accept. Walker examined the prints and made a report on February 25, 1936, before the holes had been burned. He described and approved the changes to be made and reported with reference to the openings that each hatch cover was fitted with 10-inch diameter openings with steel covers which prevented the entry of water to the hole should a sea be shipped; that after loading the hatches were covered with tarpaulins; that in his opinion installation of this description would in no way detract from the stability and seaworthiness of this vessel. Walker did not examine the ship when he made the report but obtained his information from the libelants' officials. He assumed that the work would be properly done, and he testified that it was essential to have all deck openings closed.

On July 28, 1936, the boat was loaded with 1,890 tons of gravel at Lockport. The gravel was then sprayed with water so that it was contained in the boat as wet cargo. A displacement test, taken as customary, gave the cargo weight at 2,044 tons.

After loading, the ship's draft was 12' 9" and its free board 2' 6".[1] The boat left Lockport about 5:30 p. m. On the trip up the river the crew as per custom, used the 3" pump to rid the vessel of this "wash" water. The master had directed on this trip that no tarpaulins be applied, although it was customary and required to put them on when the boat was on the lake. Just before reaching the Calumet Harbor, the 6" pump had also been used and an officer asked permission to use a larger pump (which would require the use of one of the ship's Diesel motors for its operation), because he had not been able to free the ship of water. The superior officer replied that the ship would be in within 5 or 6 minutes and that it would not be necessary to use the larger pump.

Although some of the members of the crew testified that only "spray" was hitting the deck before reaching South Chicago, others asserted that the sea was heavy and that the waves were 10 or 12 feet high. When the boat was between Rockefellow shoal and Calumet Harbor breakwater, shortly after 1 a. m. it took a sudden 45-degree list to the port side, righted itself, and then sank, all within the space of 2 minutes. There was a heavy backwash from the breakwater just before the sinking and this, libelants claim, was the cause of the sinking. There had been no time to sound the alarm and 15 of the crew were drowned. It is undisputed that the tarpaulins were not unrolled or battened down, as had been the custom, and as was required as one of the conditions of the government's permit sanctioning the construction of the holes.

The respective litigants' theories of what constitutes seaworthiness are widely divergent. The underwriters contend that all openings should have had covers with locking device so as to render them substantially water-tight, and that tarpaulins should have been used only to prevent seepage of water, whereas libelants assert that holes which have lids, most of which are locked in place, even though some are held only by gravity, afford adequate seaworthy protection if tarpaulins are battened down over them.

Respondents offered evidence to show that, (1), because of poor workmanship the lids were not perfect circles and therefore not interchangeable;[2] (2), burrs caused by acetylene burning made rough edges which would cause wear and tear in the tarpaulins and obstruct rotation of the lids to effect locking; (3), it was im-

---

[1] Her approved draft not to exceed 10 miles off shore of Lake Michigan was originally 10' 6", but this had been raised to 12' 6".

[2] Respondent's Exhibit 5, dated 6–24–36 states, "Note:—All 8" covers are interchangeable." This sketch accompanied letter of same date to local government inspectors.

possible to have the tarpaulins so taut as to hold the loose lids in place because there were some vertical projections on the hatch leaves, some 2 or 3 inches high, which prevented close contact of tarpaulin and hatch leaves; (4), a hole in the hatch leaf caused by an uncovered hole would make the tarpaulin sag over the opening, under the weight of water, causing seepage or breaking of the tarpaulin under the stress; (5), the holes were "not less than six feet apart" as specified in the government letter. They insist that liability for the captain's negligence does not arise where the insured vessel is not seaworthy. They also claim that an inaccurate report (Walker's) was submitted to the underwriters to secure their continuance as insurers after the structural change.

The District Court found that:

(1) The boat was unseaworthy on and after May 9, 1936, because of the 48 8" holes in its hatches.

(2) The cutting of the 8" holes was done in an unworkmanlike manner and they were uneven, irregular, and burred.

(3) No government permission to cut the holes was secured prior to the work and cutting them without permission was a violation of rule 6, section 5 of the Regulations of the Board of Supervising Inspectors for the Great Lakes. Therefore libelants were guilty of violation of a rule, having the force of statute. The government acquired knowledge of the holes on June 15, when United States Inspector Patterson directed libelants to submit request for permit therefor. A sketch was furnished June 24, when application was made for a permit. The government then granted permission to cut 8" holes not less than 6 feet apart.

(4) The covers were not arranged to lock by turning through one-eighth turn, or so arranged as not to work loose, as stated in application. The covers were not interchangeable.

(5) Libelants' agent Walker, a surveyor, made misstatements of fact to the underwriters in his report both as to quantity of cargo that could be carried at 12' 6" draft and in respect to the 8" holes and covers. Walker was not a Lloyds' surveyor and was not authorized so to designate himself.

(6) Inasmuch as libelants failed to comply with the regulation, they had the burden of showing that their default did not contribute to disaster and did not meet the burden.

(7) The policy allowed recovery for loss due to negligence of master "provided such loss or damage has not resulted from want of due diligence by the Owners of the vessel or any of them, or by the manager." Libelants were guilty of want of due diligence in respect to the covers.

(8) Insurers were not estopped by reason of failure to make further inquiry, after reading the Walker report which contained misstatements material to the risk.

Libelants contend that:

(1) Unseaworthiness is an affirmative defence, the burden of proof of which rests on the insurer;

(2) Underwriters insuring a vessel, having knowledge of actual conditions, are estopped to avoid policies for conditions known to them.

(3) The District Court erred in refusing proof of amount of loss of vessel.

(4) The District Court's findings are not supported by evidence.

Appellees contend that:

(1) The District Court's findings are fully supported by evidence.

(2) "Material Service" was not seaworthy at time policies attached or thereafter.

(3) Loss due to negligence of master is not covered where the owner did not exercise due diligence and here such diligence was not exercised, because Regulations of Board of Supervising Inspectors and the permit of the Bureau of Marine Inspection and Navigation were not complied with. Libelants did not meet the burden of showing such lack of compliance did not contribute to the loss.

(4) Appellees are not estopped by Walker's report; there was no waiver of compliance with government rules.

■■ The evidence discloses without any question that the holes were burned in the hatch covers as early as May, 1936, without permission of the federal marine authorities. Such action violated the general rules and regulations prescribed by the Board of Supervising Inspectors for the Great Lakes, which have the force and effect of an act of Congress. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218. The following month, an inspector,

discovering the unauthorized change in the ship's structure, directed libelants to file an application for a permit to make the alteration. The application following constituted an effort to obtain approval by the federal authorities of libelants' previous unauthorized act. In it, libelants said that the covers for the holes "were arranged to lock by turning through ⅛ turn after dropping in place, so they cannot wash up or work loose." A sketch illustrating such means of attachment and operation accompanied the application. Upon this express representation of fact, approval of what had occurred was granted with the additional requirement that tarpaulins should be provided, secured to the hatch and instantly available "should a squall come up suddenly." Libelants by their statements and representations attempted to free themselves of fault because of their violation of the rules and regulations. They failed to comply with the specification they themselves laid down in their application and left 12 of the covers wholly void of any means to secure them, except the force of gravity. Consequently libelants have never complied with the regulations and were until and including the time of the loss, continuously in default. Under the evidence, we find that this default produced unseaworthiness.

■ The underwriters had a right to believe that the owners of the vessel had complied with the law. They had a right to believe that the covers for the holes in the hatch covers could be securely locked to keep water out of the holes. Walker, the surveyor, who made the inspection, testified that any opening in a deck should be "properly closed"; that these holes constituted deck openings; that he would approve no cover which could not be so secured, unless it was protected by some additional element, and that he did not contemplate that the holes would be rough and burred. In his formal report he advised the underwriters that the steel covers for the holes prevented "entrance of water to the holes should a sea be shipped." Thus libelants' application for permit contained a representation of something not a fact, for at least 12 of the holes were not provided with covers which could be locked to prevent water entering the holes if a sea was shipped. Consequently the District Court was right in its conclusion that there was no meeting

of minds in an agreement for insurance upon a vessel which was unseaworthy, because she contained holes in her hatch covers which could not be securely closed. The question in such a case is not one of duty of the insurers to make inquiry but whether the minds of the parties in fact met in a common understanding essential to consummation of the contracts. Sun Mutual Insurance Co. v. Ocean Insurance Co., 107 U.S. 485 at page 505, 1 S.Ct. 582, 595, 596, 27 L.Ed. 337.

It matters not where the burden of proof lies, as the evidence with respect to the construction of the holes, the lack of means for securely closing them, the attempt to obtain approval of the unauthorized authorization, and the words of the report of Walker, are all undisputed. The question is as to the legal effect of these undisputed facts.

■ Nor in our opinion is there any estoppel created against the respondents by their relationship to Walker. He was a surveyor employed by the libelants, whose report respondents agreed to accept. His report was in error. He assumed that the libelants would comply with the requirements of the marine authorities by providing means for the securing of all of the covers and so reported to the respondents. He reported what was expected, not the fact. Respondents in making a contract had a right to believe that libelants and their agent, whose report respondents agreed to accept, would report correctly the actual condition. This was not done; the result was a mistake of fact between the parties, irrespective of the agreement to accept his report. No estoppel arises from a mistake of fact, preventing the meeting of the minds of the parties; on the contrary an estoppel must have its origin in clearly understood facts and a waiver does not arise unless all material facts are disclosed. The condition which existed at the time the loss occurred by reason of the failure of the owners to comply with the requirements of the marine authorities and the plain intendment of Walker's report indicating effective prevention of water entering the holes, and respondents had no other knowledge of the facts. If concealment of material facts exists, even though not intentional, it creates a mistake of fact that prevents consummation of an agreement, by the meeting of the minds upon agreed facts. In our opinion the question of

agency has no bearing upon this conclusion.

If we are in error in our belief that the contracts never became effective, the evidence does not disclose a loss covered by the policies. They provided that the insurance should cover loss occurring through "negligence of the master, mariners, engineer or pilot," provided however, that "such loss has not resulted from want of due diligence by the owners." As we have pointed out, the court was justified in concluding that the cause of the loss was the entry of water through 12 of the holes which could not be closed except by gravity and battened down tarpaulins. This defect, as we have seen, was the result of libelants' failure to comply with the requirements constituting a condition precedent to the grant of permission to make the holes. The continuation of this failure until the time of the loss was want of due diligence upon the part of the owner. Again, irrespective of the burden of proof, the evidence is undisputed that the owner at no time provided means for securing the covers on 12 of the holes other than the force of gravity and battened down tarpaulins. Under the cited clauses of the policy and the findings of the court, of which we approve, justified by the evidence, the loss occurred under the exception of the clause, namely, lack of due diligence by the owners. Consequently there was no liability. Chicago Steamship Lines v. United States Lloyds, 7 Cir., 12 F.2d 733.

Nor are we persuaded by any evidence contained in the record that the provision of tarpaulins to place over the holes relieved libelants. Under the finding either that there was no meeting of the minds or that there was lack of due diligence upon the part of the owners, libelants having asked approval of their action upon the express stipulation that lids or covers which would lock would be or had been provided, their position is in nowise bettered by the fact that they did provide tarpaulins. The latter were only one of two means required to effect seaworthiness. Both, under the evidence were essential, and the lack of the one is fatal.

The findings of the District Court were proper under the evidence. Under those findings the conclusions are inevitable. The decree of the District Court is affirmed.