RELIANCE INSURANCE COMPANY
and New York Marine & General
Insurance Company, Plaintiffs,

v.

CERTAIN MEMBER COMPANIES,
Institute of London Underwriters,
Defendants.

No. 93 Civ. 5304 (DC).

United States District Court,
S.D. New York.

June 1, 1995.

Chalos & Brown by David H. Fromm, Harry A. Gavalas, New York City, for plaintiffs.

Thacher Proffitt & Wood by John M. Woods, Joseph G. Grasso, New York City, for defendants.

### OPINION

CHIN, District Judge.

On May 12, 1993, workers aboard the vessel SAMICK NORDIC off the coast of Saudi Arabia were welding a hatch on deck. Sparks fell below onto a cargo of plywood. First the plywood and then the ship caught fire. The ship burned for over a week, and the entire cargo was destroyed.

The plywood was insured by defendants, Certain Member Companies of the Institute of London Underwriters (the "London Underwriters"), who in turn had entered into a "binder" of reinsurance with plaintiffs Reliance Insurance Company ("Reliance") and New York Marine & General Insurance Company ("NYMGIC").

Plaintiffs commenced this action seeking a declaratory judgment that the reinsurance binder is void *ab initio*. The London Underwriters have asserted a counterclaim for a declaratory judgment that the reinsurance agreement is valid and binding; they also seek recovery of $2,043,740.24, the amount that would be due if the reinsurance agreement is valid.

The case was tried to the Court from May 15 to 18, 1995. For the reasons set forth below, judgment will be entered in favor of plaintiffs. Pursuant to Fed.R.Civ.P. 52(a), the following are my findings of fact and conclusions of law.

## THE FACTS

The London Underwriters are direct cargo insurers of Apkindo, a consortium of Indonesian plywood and lumber products producers. Apkindo is also sometimes insured directly by an Indonesian insurance company, Tugu Pratama Indonesia, or its affiliate, Tugu Hong Kong (collectively "Tugu"). Apkindo's direct insurance is written on an "all risks" basis, *i.e.*, losses are covered no matter what the cause (with certain limited exceptions) and whether total or partial. (JPTO ¶¶ 3, 4).[1]

The London Underwriters are the direct insurers of all of Apkindo's shipments going to the United Kingdom/Europe, including the shipment lost on the SAMICK NORDIC. (Klima Dep. 145–46). Tugu is involved on these shipments as an original reinsurer of 40% of the London Underwriters' interest. (Klima Dep. 146).

Apkindo's direct insurance has been placed for a number of years by the London insurance broker, Energex International Insurance Brokers, Ltd. ("Energex"). (Tr. 501). David Klima is the deputy managing director of Energex who has been responsible for the Apkindo account. (Tr. 498, 501).

In the marine insurance industry, "Free of Particular Average"—or "FPA"—coverage is limited coverage for total loss of cargo (regardless of cause) and partial loss of cargo caused by certain specified casualties, such as collision, fire, stranding or sinking. (JPTO ¶ 7; *see* Tr. 288–89).

In the insurance year from April 1, 1992 to March 31, 1993, the London Underwriters paid in excess of $2.4 million for two losses sustained by Apkindo of the type that would have been covered under an FPA policy. (TX 1; Tr. 502–03, 507). As a result of these losses, at the conclusion of the negotiations for the renewal contract, Klima of Energex and Ken Hopwood, who was the lead underwriter, decided to explore the possibility of reinsuring the FPA exposure. (Tr. 503).[2] Although Hopwood made no commitment, he indicated to Klima that the London Underwriters would "move forward" with reinsuring the FPA exposure if "it was obtainable at the appropriate cost." (Tr. 504; *see* Hopwood Dep. 90, 93 (Hopwood expressed "an interest" in purchasing the proposed reinsurance)).

In March 1993, Energex also discussed the FPA reinsurance proposal with Tugu's London representative, who passed the proposal on to Tugu's offices in Indonesia and Hong Kong. (Tr. 515–16). Although there were positive indications from Tugu's London representative, the decision was to be made in Indonesia and Hong Kong. (Tr. 516). As of March 31, 1993, Energex had not received a "definitive answer either way" from Tugu. (Klima Dep. 96–97; *see also* Tr. 523). In mid to late April, Klima was advised that Tugu was declining the FPA reinsurance. (Tr. 519).

In early March, Energex prepared a written proposal for the FPA reinsurance. (Tr. 508; TX 34). Klima made no effort to market the FPA reinsurance in London, even though London underwriters often reinsure themselves. (Tr. 556–57; *see also* Tr. 610). He did, however, send the proposal to Nausch, Hogan & Murray ("NH & M"), insurance brokers in the United States, inviting them to market the proposal in the United States. (Tr. 509). It was Energex's intent that 100% of the FPA risk be reinsured. (*See* Hopwood Dep. 98 ("We would only have reinsured FPA 100%.")).

Scott Darragh, a broker with NH & M, received the proposal from Energex by facsimile in March 1993. (Tr. 432; TX 26H). He had a follow-up telephone conversation with Klima, during which he wrote on his copy of Energex's proposal "100% or TBA [to be advised]"; this note reflected Darragh's understanding that the proposal "was looking for one hundred percent FPA reinsurance of

---

1. References to "JPTO" are to the Undisputed Facts section of the First Amended Joint Pre-trial Order; to "Tr." are to pages of the trial transcript; to "TX" are to the trial exhibits received in evidence; and to "Dep." are to pages of the transcripts of the deposition excerpts introduced at trial.

2. Hopwood suggested to Klima that "profit potential" would be increased "were it possible to effect a reinsurance coverage." (Klima Dep. 89).

the reassureds that were listed on the top." (Tr. 433, 457; TX 26H). Darragh made the note because it "assisted" him in "understanding" the proposal, by "clarify[ing] the hereto" clause contained in the written proposal. (Tr. 457, 459; TX 26H).

Darragh took the Energex proposal, made a few changes, and had it retyped onto NH & M letterhead. (Tr. 434–36; TX 1). He made no revisions to the "reassured" or "hereto" clauses. (*Compare* TX 26H *with* TX 1). The "reassured" clause at the top of the proposal, which was dated March 16, 1993, listed the "reassured" as follows:

"TUGU PRATAMA INDONESIA AND/OR TUGU HONG KONG AND/OR LONDON UNDERWRITERS."

(TX 1). The "hereto" clause read as follows: "Order to be advised, but

| provisionally— | | |
|---|---|---|
| | U.K. | (60%) |
| | Europe | (60%) |
| | China | (51%) |
| | Japan | (25%)" |

(TX 1).

On or about March 16, 1993, Darragh brought the retyped proposal to Michael Hyland at Reliance. (Tr. 434, 437; TX 1). Hyland had known Darragh for some twelve years at the time (Tr. 46), and Darragh testified that he and Hyland were friends. (Tr. 486). Hyland and Darragh met for approximately ten minutes discussing the proposal, and Hyland reviewed the written proposal in Darragh's presence. (Tr. 48–49, 437–38).

Hyland raised several concerns, but there was no discussion of who the reassureds were, nor was there any discussion of whether the reassureds were retaining any portion of the risk being reinsured. (Tr. 55, 79, 128, 440).[3] Hyland believed the reassured to be Tugu, and he read the proposal to mean that

60% of the FPA risk was being ceded and that Tugu, as the reassured, would be retaining 40% of the FPA risk. (Tr. 51, 53–54, 56, 67, 70).[4]

On or about March 31, 1993, Hyland signed a binder of reinsurance on behalf of Reliance. (Tr. 66; TX 6). When he did so, he believed that Reliance was agreeing to a "60% participation," *i.e.*, that Reliance was taking 100% of 60% (or 51% or 25% on shipments to China and Japan, respectively) of the FPA risk, with the reassured retaining 40% (or 49% or 75% on shipments to China and Japan, respectively). (Tr. 66–67, 70; TX 4, 6).

Although Hyland agreed to take 100% of the (up to) 60% of the FPA risk, he asked NH & M to try to find another company to share the risk. (Tr. 71). Coincidentally, after NH & M had advised Energex that Reliance had accepted the proposal, Energex also asked NH & M to try to find another company to assume a portion of the reinsurance to spread the risk. (Tr. 446).

As a result, NH & M marketed the proposal—after Reliance had accepted it—to other underwriters. (Tr. 446). The proposal was received by Peter Turoff at NYMGIC by facsimile on April 5, 1993. (Tr. 141; TX 13). Turoff understood the proposal to be one for "proportional reinsurance of the F.P.A. perils varying up to 60 percent." (Tr. 148). It was his understanding that the "portions that weren't being bound" by Reliance and NYMGIC were "being retained by the reassured." (Tr. 148; *see also* Tr. 167). Eventually NYMGIC agreed to take 40% of the "cover." (Tr. 446). A revised binder of reinsurance, dated April 8, 1993, was signed on behalf of both Reliance and NYMGIC, with Reliance reducing its interest from 100% to

---

**3.** Darragh testified that he mentioned to Hyland at the beginning of the meeting that the proposal called for "one hundred percent FPA reinsurance" of the underwriters listed as reassureds, "potentially one of them or all of them." (Tr. 438). He also testified that at the end of the meeting Hyland "was agreeable to taking a hundred percent." (Tr. 442–43). This testimony is *rejected*, as I do not believe Darragh was credible in this respect.

**4.** The 60% figure applied to shipments to the United Kingdom and Europe. The percentages

were different for shipments to China and Japan. (TX 1).

Although I have described the proposal as one for "FPA reinsurance," in fact the proposal was for more than just FPA risks; it also included coverage for the conditions set forth in clause 32B–10 of the standard clauses of the American Institute of Cargo. (Tr. 291; TX 1, 2). For ease of reference, I will continue to refer to the proposal as one for "FPA" reinsurance.

60% of the interest being reinsured and NYMGIC taking 40% of the interest being reinsured. (TX 7).[5]

On May 12, 1993, while workers were welding a hatch on deck, the SAMICK NORDIC and its cargo of plywood caught fire. (TX 12; Tr. 367–68). The ship continued to burn for over a week, and the cargo of plywood was totally destroyed. A portion of the cargo aboard the SAMICK NORDIC was subject to the reinsurance binder entered into by plaintiffs. (JPTO ¶ 9). Darragh telephoned Hyland to advise him of the loss, and a meeting followed shortly thereafter. (Tr. 72, 217). Turoff was advised of the loss on May 18, 1993. (Tr. 157; TX 22).

On May 18, 1993, NYMGIC gave NH & M written notice of cancellation of the reinsurance agreement. (Tr. 160; TX 23). Reliance also cancelled its reinsurance agreement. (Tr. 450). NYMGIC and Reliance did so because they believed they had been misled: they believed they had entered into a reinsurance arrangement with Tugu—or, in the case of NYMGIC, Tugu Indonesia and/or Tugu Hong Kong and/or London Underwriters—as the reassured, and they believed that the reassured—whoever it was—was retaining 40% of the FPA risk. (Tr. 120, 125, 167; Frediani Dep. 23; TX 4).

In fact, however, as plaintiffs later learned, there was no contractual relationship with Tugu at all (Tr. 77, 95–96, 120); instead, the reassured was London Underwriters, who had ceded 100% of its FPA exposure. Hence, Reliance and NYMGIC ended up reinsuring a reassured who had zero retention of the FPA risk. (Tr. 120, 125, 162).

The remaining 40% of the FPA exposure had been kept by Tugu, which had rejected Energex's reinsurance proposal.

If Reliance and NYMGIC had known that the actual reassured was the London Underwriters and that the London Underwriters had not retained any portion of the FPA risk, they would not have bound the risk, for they would have been skeptical of reinsuring any risk that the London Underwriters wanted to cede 100%. (Tr. 77–78, 125).[6] The refusal of a reassured to retain any portion of a risk is not customary, at least outside the context of "blue water hull" insurance or situations involving "fronting," and shows a lack of confidence in the risk. (Tr. 77–78, 91–92, 168, 312, 377–78, 399–401, 402–04; Cullen Dep. 56).[7]

Defendants requested reimbursement from plaintiffs under the binder, but plaintiffs refused to pay. The losses for which reinsurance coverage is disputed in this case amount to $2,043,740.24, subject to reduction for any recovery in subrogation against the vessel interests. (JPTO ¶ 13). On August 11, 1993, the quarterly premium due under the binder of reinsurance was tendered to plaintiffs. The premium was refused, however, and is being held in escrow pending the outcome of this lawsuit. (JPTO ¶ 12).

This suit followed.

## DISCUSSION

This case presents the following issues: (1) whether plaintiffs reasonably believed that the reassured under the reinsurance binder was retaining some portion of the FPA risk; (2) whether, if so, defendants' brokers misled

---

5. The binder contained a $50,000 "franchise," *i.e.*, a provision that losses of less than $50,000 were excluded but were payable in full when greater than $50,000. (TX 1; Tr. 358–59). Consequently, the reinsurance binder only covered losses in excess of $50,000, although those losses were payable in full.

6. Even Hopwood, the lead London Underwriter, acknowledged that in writing reinsurance, he had relied on retention in making a decision to reinsure. (Hopwood Dep. 80).

7. As one of plaintiffs' experts explained:
   [Y]ou have very little information, underwriting information, when you're reinsuring another company on cargo. So you have to rely

very much on the person who's offering you the reinsurance to look after the store.
(Tr. 285). He added that it would be important to know that it was London Underwriters who was ceding 100% of the risk, for the London Underwriters would not have placed the reinsurance on the market in the United States unless there was a problem with the risk. (Tr. 307). The identity of the reassured may also dictate what terms the reinsurer seeks; for example, while a reinsurer would want a claims cooperation clause from Tugu, such a clause would not be necessary if the reassured were London Underwriters, because of the latter's expertise in adjusting claims. (Tr. 310, 329).

plaintiffs; and (3) whether, if so, defendants breached their duty of *uberrimae fidei*, *i.e.*, their duty to act with the highest degree of good faith.

### 1. *Plaintiffs' Belief*

■ I find that plaintiffs reasonably believed, when they accepted the reinsurance proposal, that the reassured was retaining a portion of the FPA risk.

First, although there were some problems with both their testimony in certain respects,[8] I found both Hyland and Turoff to be credible with respect to their testimony that they believed, when they accepted the proposal, that their respective companies were agreeing to reinsure 60% (or 51% or 25%) of the reassured's FPA risk with the reassured retaining 40% (or 49% or 75%).

Second, NH & M's written proposal (TX 1) could reasonably be read as an offer to reinsure 60% of the reassured's FPA exposure. The hereto clause is ambiguous: it does not specify whether the percentages listed refer (a) to 60% (or 51% or 25%) of 100% of the FPA risk or (b) to 100% of the London Underwriter's 60% (or 51% or 25%) share of the total FPA risk. Indeed, the first interpretation is the more reasonable one, since the latter interpretation requires the addition of two facts not readily apparent from the document: that only the London Underwriters were seeking reinsurance and that the London Underwriters only had 60% of the FPA risk.[9]

Third, the customary practice in reinsurance (with the exceptions of "blue water hull" insurance and "fronting" situations, which exceptions are not applicable to this case) is for the reassured to retain a portion of the risk.

Plaintiffs presented four witnesses who testified that it was highly unusual for a reassured to cede 100% of its risk, and the testimony of plaintiffs' witnesses that a 100% cession showed lack of confidence on the part of the reassured in the risk makes sense. The only witness who suggested that it was not uncommon for a reassured to cede 100% of an FPA risk (it happens "[a]ll day and every day" (Tr. 598)) was defendant's purported expert witness. The witness, however, conceded that he had "no experience generally" in the American market. (Tr. 606). In fact, he testified that *he* did not believe that he was an expert on reinsurance in the American market. (Tr. 607–08). Hence, his opinions are entitled to little if any weight.

### 2. *The Brokers' Actions and Omissions*

■ The mere fact that plaintiffs reasonably believed the reassured was retaining a portion of the FPA risk does not, of course, end the inquiry. Rather, plaintiffs must also show that they were misled by the brokers into believing that the reassured was retaining a portion of the reinsurance risk. I find that plaintiffs were misled and induced into accepting the reinsurance proposal by the brokers' actions and omissions.

Although the issue of retention and the identities of the reassured were not explicitly discussed in the negotiations leading up to execution of the binder (Tr. 128, 175, 179), the proposal (TX 1) was still misleading. The "reassured" clause listed *both* Tugu and London Underwriters as possible reassureds. Hence, the proposal suggested—at minimum—that Tugu was interested in reinsuring a portion of its risk.

---

8. For example, at one point on cross-examination, Turoff conceded that his testimony had "changed." (Tr. 197). Nonetheless, although there was some confusion when the proposal was first discussed within NYMGIC (Tr. 199–202), at the time the order was bound, Turoff believed he was binding NYMGIC to 40% of 60% of the FPA risk. (Tr. 202–03; *see also* Tr. 208–09).

    Hyland testified that he understood that defendants were seeking reimbursement for not 60% but 100% of the loss. (Tr. 79, 99). Inexplicably, he still had this misimpression at trial. (Tr. 99–100). His understanding, however, was based on information from David Thomson (Tr. 99),

who was told by Energex that Reliance and NYMGIC had "100 percent of the risk." (Tr. 230).

9. The testimony of defendants' purported expert, Norman Tucker, that TX 1 is "[a]bsolutely clear" and that there is "[n]o doubt in [his] mind" that the hereto clause provides for a 100% cession of the reassured's 60% FPA risk (Tr. 611) is rejected. Even counsel for defendants acknowledged in his summation that there was some ambiguity if one were to look just within the four corners of the document. (Tr. 627).

In fact, however, Energex did not have any positive indication of interest from any of the decisionmakers at Tugu, and Tugu ultimately rejected the proposal. Hence, Energex was only acting on behalf of London Underwriters when it shopped the proposal to the United States market, and the suggestion that it was also acting for Tugu was misleading. (Tr. 301–02, 395–96).[10] This suggestion was important, for plaintiffs would have looked at the proposal differently if they had thought the only reassured was London Underwriters. (*See, e.g.,* Tr. 285, 307, 310, 329).

To compound the problem, although the reassured clause made reference to both Tugu and London Underwriters, the reference to the percentages in the "hereto" clause purportedly referred *only* to the London Underwriters' percentage interests, and did not include Tugu's percentage interests. But because the reassured clause made reference to both Tugu and London Underwriters, plaintiffs could not know, from the face of the proposal, that the percentages in the hereto clause were 100% of the London Underwriters' percentages. Indeed, because the reassured clause referred to both Tugu and London Underwriters, plaintiffs were led to believe that the references to 60% (and 51% and 25%) in the hereto clause were to 60% (and 51% and 25%) of the reassured's interest and that, consequently, the remaining 40% (and 49% and 75%) of the FPA risk was being retained by the reassured.

The brokers knew or should have known that the proposal was misleading. Scott Darragh had to clarify Energex's written proposal by making a note to himself on his copy of the proposal to clarify that the proposal was looking for 100% FPA reinsurance of the reassured. (TX 26H; Tr. 433, 457, 459). Although he found it necessary to make a note to assist him in understanding the proposal, he did not include the clarification in the proposal that he had re-typed.

(*Compare* TX 26H *with* TX 1). In fact, NH & M prepared a written proposal—dated March 16, 1993, the same date as TX 1—that made it clear that the reassured(s) were seeking 100% reinsurance, but this proposal was *not* used. (TX 26%; Tr. 495–98).

The brokers could—and should—have made the proposal clearer. They could have, for example, written the hereto clause to state that the order was "for 100% part of 60%." (*See* Tr. 398). As Mr. Cox, one of plaintiffs' experts, testified, the brokers "had an order for 100 percent [of] the 60 percent … [b]ut [they] didn't so stipulate...." (Tr. 410). As Mr. Byron, plaintiffs' other expert, explained, the brokers should have explained (i) that their client was London Underwriters, (ii) that London Underwriters wanted to reinsure 100% of their FPA exposure, which was 60% of the total FPA exposure, and (iii) that there was a possibility "down the road" of Tugu also reinsuring all or part of its 40% interest in the FPA risk. (Tr. 304).

The brokers failed to disclose the fact that the reassured was ceding 100% of its FPA risk, and they drafted a proposal that was unclear and misleading. As a result, plaintiffs were misled into believing that the reassured was retaining up to a 40% interest in the risk, and they were induced to bind a risk that they might not have bound had they known the complete picture.

### 3.  *The Duty of Uberrimae Fidei*

█   As the evidence in this case showed, marine insurance contracts are unlike other arms-length commercial transactions in that marine insurance binders are often signed "on trust," and risks are often bound even where significant information has not been provided. (Tr. 346). Here, for example, Reliance originally bound itself to a $6 million risk even though the order was only "provi-

---

**10.** Darragh testified that he did not know whether Energex had spoken to London Underwriters or Tugu or had a "provisional order" from either of them. (Tr. 466). In fact, although Darragh acknowledged that there were 92 possible reassureds (and possible combinations thereof), he had "no idea" who they were and he did not know who the ultimate client was. (Tr. 467, 469). Indeed, he did not know who the actual

reassureds were until after the loss was sustained, and when he testified, he was still uncertain of the underlying insurance arrangements. (Tr. 483–84). Defendants' own expert witness testified that it was not "good brokering practice" for Darragh to be shopping a proposal "without understanding the underlying coverages." (Tr. 616).

sional" and was "to be advised" (TX 6), and NYMGIC bound itself to a $2.4 million risk even though Turoff had asked questions of the broker that were not answered. (Tr. 145). In fact, Darragh took the position that the binder was enforceable even though the final policy could have provided reinsurance for as few as 1 and as many as 92 reassureds for between as little as 0% and as much as 100% of the FPA risk. (Tr. 471).

The doctrine of *uberrimae fidei* developed out of the recognition that the marine insurance contract

> is conceived in the uttermost good faith and incubated in a legal environment which transcends the sharper practices of the world of commerce.

*Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004, 1014 (D.R.I.1984) (applying both federal admiralty law and New York law). Under the doctrine,

> the parties to a marine insurance policy must accord each other the highest degree of good faith.... This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk being insured.

*Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986) (*citing Puritan Ins. Co. v. Eagle S.S. Co.,* 779 F.2d 866, 870 (2d Cir.1985)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

A contract will not be voided under the doctrine of *uberrimae fidei* "unless the undisclosed facts were material and relied upon." *Puritan Ins. Co.,* 779 F.2d at 871. A fact is not "material" unless a reasonable person in the assured's position would know that the particular fact is "something which would have controlled the underwriter's decision." *Knight,* 804 F.2d at 13 (*quoting Btesh v. Royal Ins. Co.,* 49 F.2d 720, 721 (2d Cir. 1931)).

The courts have recognized that the doctrine of *uberrimae fidei* is particularly important in the reinsurance context because of the "special relationship that exists between reinsured and reinsurer." *Compagnie de Reassurance d'Ile de France v. New England Reins. Corp.,* 825 F.Supp. 370, 380 (D.Mass.1993) (*citing A/S Ivarans Rederei v.*

*Puerto Rico Ports Authority,* 617 F.2d 903, 905 (1st Cir.1980)). As the Supreme Court held many years ago:

> In respect to the duty of disclosing all material facts, the case of reinsurance does not differ from that of an original insurance. The obligation in both cases is one [of] uberrimae fidei.... *The exaction of information in some instances may be greater in a case of reinsurance than as between the parties to an original insurance.* In the former, the party seeking to shift the risk he has taken is bound to communicate his knowledge of the character of the original insured, where such information would be likely to influence the judgment of an underwriter; while in the latter, the [original insured] ... is 'not bound, nor could it be expected that he should speak evil of himself.'

*Sun Mutual Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510, 1 S.Ct. 582, 599–600, 27 L.Ed. 337 (1883) (emphasis added). *See also A/S Ivarans Rederei v. Puerto Rico Ports Authority,* 617 F.2d 903, 905 (1st Cir.1980) ("As between the reinsured and the reinsurer, there is no principle of imputed knowledge of facts material to the risk that the reinsurer is asked to assume; to the contrary, there is a duty on the reinsured to disclose such facts.").

Here, defendants did not act with the highest degree of good faith. The brokers, who were acting as defendants agents, failed to disclose to plaintiffs the fact that the only reassured—London Underwriters—was ceding 100% of its FPA risk.

As Darragh himself conceded, this fact was a material one. (Tr. 455–56). Moreover, as I have found, plaintiffs would not have bound the risk had they known that the only reassured was London Underwriters and that London Underwriters was ceding 100% of its risk. A reasonable underwriter in plaintiffs' position surely would have found material the fact that London Underwriters desired to unload *all* of its FPA risk. As the Supreme Court of Louisiana held in 1896:

> [I]n reinsurances the general rule is the original insurer retains part of the risk, and in the event of total loss, to the extent of the amount retained, shares the loss with the reinsurers. If this is not the

reinsurance desired, but the reinsurance of the *entire* risk, for obvious reasons good faith exacts that the purpose should be stated to the reinsurer.

*Chalaron v. Insurance Co. of North America*, 48 La.Ann. 1582, 1585, 21 So. 267, 269 (1896) (emphasis added). Here, defendants' duty to act in the utmost good faith required them to disclose to plaintiffs that the "purpose" of the binder was "reinsurance of the *entire* [FPA] risk."

Relying on the undisputed fact that the brokers made no affirmative statements about retention of a portion of the risk, defendants argue that plaintiffs had a duty to ask about retention and they contend that plaintiffs breached their duty to make adequate inquiry. (Def.Trial Mem. at 8; *see also* Tr. 640–41). I disagree. To the contrary, the cases make it clear that because the assured (or reassured in a reinsurance situation) "is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire." *Knight*, 804 F.2d at 13. *Accord Contractors Realty Co. v. Insurance Co. of North America*, 469 F.Supp. 1287, 1294 (S.D.N.Y.1979) ("The doctrine of Uberrimae fidei obligates the assured to *volunteer* information which might have a bearing on the scope of the risk assumed, and the failure to do so will allow the insurer to avoid the policy.") (emphasis added). Moreover, the fact of the matter is that plaintiffs' representatives did not inquire about retention because they fairly and reasonably assumed there was a 40% (or 49% or 75%) retention. (*See* Tr. 377) (testimony of plaintiffs' expert, Cox: "Personally, I very well may have not asked if there was a retention. I would have made that assumption.").

Defendants also argue that whether plaintiffs misunderstood the reinsurance binder or not, the amount of the exposure remained the same, *i.e.*, whether it was 100% of 60% or 60% of 100%, it was still an exposure of $6 million. (Def.Trial Mem. at 12). The problem with this argument, of course, is that it ignores the fact that plaintiffs would not have bound the risk at all if they had known that the only reassured was London Underwriters

and that London Underwriters was ceding 100% of the risk.

Defendants' reliance on *Insurance Co. of North America v. Hibernia Ins. Co.*, 140 U.S. 565, 11 S.Ct. 909, 35 L.Ed. 517 (1891), is misplaced. That case simply held that an insurer who reinsured the excess of its risks over $50,000 was not thereafter bound to carry the first $50,000 itself, but could reinsure the first $50,000 with other companies. 140 U.S. at 573–74, 11 S.Ct. at 911–12. Significantly, nothing in the excess reinsurance policy precluded the insurer from thereafter reinsuring the first $50,000 in risk. *Hibernia* does *not* stand for the proposition that the fact that a reassured cedes 100% of its risk is not material. Moreover, unlike in the present case, where the insurers (through their brokers) solicited the reinsurance from reinsurers, the reinsurer in *Hibernia* solicited a portion of the *insurer's* business. 140 U.S. at 572, 11 S.Ct. at 910–11.

■ Finally, it is worth noting that plaintiffs are not required to prove intent to show a violation of the duty of *uberrimae fidei.* Rather, "[t]he duty of communication, indeed, is independent of the intention, and is violated by the fact of concealment even when there is no design to deceive." *Sun Mutual Ins. Co.*, 107 U.S. at 510, 1 S.Ct. at 599. *Accord Compagnie de Reassurance*, 825 F.Supp. at 380. While I need not reach the issue in this case, plaintiffs did present substantial evidence of a "design to deceive." First, the London brokers made no effort whatsoever to market the reinsurance proposal in London, even though underwriters in London have been reinsuring themselves for many years and reinsurance of FPA risks is common. Second, it was highly misleading to refer to Tugu and London Underwriters in the reassured clause while referring to what were just the London Underwriters' percentages in the hereto clause. Third, the New York brokers failed to clarify the written proposal even though Darragh found it necessary to make a clarifying note to himself following his discussion with Klima. Fourth, the New York brokers prepared a written proposal that would have made it clear that the reassured was looking to cede 100% of the FPA risk; yet, this clear proposal was

not used, and instead the unclear proposal was utilized. Fifth, the New York brokers chose to market the proposal to two inexperienced (in marine cargo insurance) underwriters. Finally, both Energex and NH & M stood to earn substantial commissions if the reinsurance was written. Whether defendants (and their brokers) intended to deceive plaintiffs or not, clearly plaintiffs were misled.

## CONCLUSION

Judgment will be entered in favor of plaintiffs declaring the binder of reinsurance (TX 7) void *ab initio* and dismissing the counterclaim. Plaintiffs are directed to submit a proposed judgment on notice in accordance with Civil Rule 8.

SO ORDERED.