992 F.Supp. 278 (1998)
ALLENDALE MUTUAL INSURANCE COMPANY, Plaintiff,
v.
EXCESS INSURANCE COMPANY LTD., London and Hull Maritime Insurance Company, Ltd, Farnam, T A/C, the Ocean Marine Insurance Company Ltd., the Yorkshire Insurance Company, Ltd., Perte C A/C, Prudential Assurance Company, Ltd., Trust A/C No. 2, English and American Insurance Company, Ltd., Switzerland Insurance Company UK, Ltd., Nippon Insurance Company of Europe Ltd., Fuji International Insurance Company Ltd., English and American Underwriting Agency Ltd., Cornhill Insurance Company PLC, Minster Insurance Company, Ltd., the Threadneedle Insurance Company, Ltd., Sovereign Marine and General Insurance Company Ltd., Tokio Marine and Fire Insurance Company (U.K.) Ltd., Willis Faber (Underwriting Management) Ltd., Certain Underwriters at Lloyds of London Consisting of: Lloyd's Underwriter Syndicate No. 317 RMO, Lloyd's Underwriter Syndicate No. 457 WTK, Lloyd's Underwriter Syndicate No. 658 NTE, Lloyd's Underwriter Syndicate No. 1028 HRD, Lloyd's Underwriter Syndicate No. 207 EDW, Lloyd's Underwriter Syndicate No. 904 GKS, Lloyd's Underwriter Syndicate No. 401 BRI, Lloyd's Underwriter Syndicate No. 406 IAM, Lloyd's Underwriter Syndicate No. 535 COT, Lloyd's Underwriter Syndicate No. 787 FBB, Lloyd's Underwriter Syndicate No. 500 TJP, Lloyd's Underwriter Syndicate No. 448 AJW, Lloyd's Underwriter Syndicate No. 52 HUN, Lloyd's Underwriter Syndicate No. 1014 MAC, Lloyd's Underwriter Syndicate No. 613 MJB, Lloyd's Underwriter Syndicate No. 855 ARM, Lloyd's Underwriter Syndicate No. 724 SAH, Lloyd's Underwriter Syndicate No. 162 GLO, Lloyd's Underwriter Syndicate No. 1158 BMR, Lloyd's Underwriter Syndicate No. 40 KJC, Lloyd's Underwriter Syndicate No. 488 JCH, Lloyd's Underwriter Syndicate No. 34 DGL, Lloyd's Underwriter Syndicate No. 123 AWS, Lloyd's Underwriter Syndicate No. 609 MED, Lloyd's Underwriter Syndicate No. 552 MAN, Lloyd's Underwriter Syndicate No. 31 MFS, Lloyd's Underwriter Syndicate No. 803 GWH, Lloyd's Underwriter Syndicate No. 428 RFW, Lloyd's Underwriter Syndicate No. 697 STQ, Lloyd's Underwriter Syndicate No. 1035 EVE, Lloyd's Underwriter Syndicate No. 920 HLP, Lloyd's Underwriter Syndicate No. 872 EPI, Lloyd's Underwriter Syndicate No. 932 PJG, Lloyd's Underwriter Syndicate No. 936 CRE, Lloyd's Underwriter Syndicate No. 79 SCM, Lloyd's Underwriter Syndicate No. 102 KER, Defendants.
No. 95 CIV. 10970 SAS.
United States District Court, S.D. New York.
February 3, 1998.
*279 *280 Bernard London, James L. Fischer, James Walsh, New York, NY, for Plaintiff.
Larry S. Kaplan, Richard A. Walker, Kaplan, Begy & Von Ohlen, Chicago, IL, Robert J. Brown, Chalos & Brown, New York, NY, for Defendants.

OPINION AND ORDER
SCHEINDLIN, District Judge.
Plaintiff Allendale Mutual Insurance Company ("Allendale") filed a Complaint on December 28, 1995, alleging breach of contract. According to the Complaint, the defendant reinsurers breached the parties' agreement in three ways: 1) by wrongfully refusing to pay a $7 million claim, 2) by failing to investigate this claim in good faith, and 3) by initiating suit on the contract in England in spite of its forum-selection clause.[1] The Findings of Fact and Conclusions of Law set forth below are based on a seven day bench trial held December 15-23, 1997.

I. Findings of Fact
Allendale is an insurance company incorporated under the laws of Rhode Island. The defendants are reinsurers organized under the laws of the United Kingdom. See Joint Pretrial Order, Undisputed Facts ("Undisputed Facts") at ¶¶ 1-2. Effective January 1, 1991, Factory Mutual International ("FMI"), an Allendale subsidiary, issued an insurance policy to Zenith Data Systems France and Zenith Data System Europe ("Zenith") covering physical losses at Zenith's Seclin, France warehouse up to 248,301,000 French francs (approximately $48 million). See Trial Ex. 1. This policy was 100% reinsured by Allendale, See Trial Ex. 2, who in turn sought reinsurance for all but $2.5 million of the risk.
Pursuant to this effort, a $7 million layer of the risk was offered to defendants through a series of intermediaries. Defendants indicated a desire to accept for the period between January 1, 1991 and January 1, 1992 by initialing a broker's slip (the "first contract") which briefly described the Seclin warehouse and the terms of the contract. Among these terms was one that provided: "Service of Suit Clause (U.S.A.)." The parties agree that this notation incorporates by reference a clause taken from an industry handbook which provides, in pertinent part: "It is agreed that in the event of the failure of the [defendants] . . . to pay any amount claimed to be due hereunder, the [defendants], at the request of [Allendale], will submit to the jurisdiction of a court of competent jurisdiction within the United States of America." Trial Ex. 51; Trial transcript ("tr.") at 417. The slip also disclosed that the warehouse was "non sprinklered." See Trial Ex. LLLL.
*281 Before initialing the slip, defendants added a handwritten inscription which stated: "sub all recs complied with within 60 days of receipt of survey by reassured." See id. The parties agree that "sub," in this context, is shorthand for "subject to" and that "recs" is short for "recommendations." See Plaintiff's Post Trial Memorandum of Law at 12-13; Plaintiff's Proposed Findings of Fact at ¶ 66; Defendants' Proposed Findings of Fact at ¶ 36. Shortly after execution of the contract, the parties agreed to change its expiration date to June 1, 1991. See tr. at 316.
On January 28, 1991, the Seclin warehouse was surveyed by an FMI engineer. See tr. at 487-88. The report drafted as a result of this inspection (the "survey report") included a section titled "Recommendations." This section included the following six entries:
[1] A cutting and welding permit procedure should be implemented whenever cutting or welding operations have to take place . . .
[2] Fire hoses fed by the public main should be installed according to Factory Mutual standards throughout the warehouse building . . .
[3] Automatic sprinkler protection should be provided throughout the warehouse according to Factory Mutual standards . . .
[4] The above sprinkler protection should be fed by an adequately sized water supply consisting of a pump and a tank . . .
[5] Given the total value of the goods stored, a second water supply should be provided for reliability . . .
[6] A burglar alarm system should be installed to supplement the present watch service and further protect the goods of the warehouse from theft . . . .
Trial Ex. D1. Each recommendation was followed by a "comment;" the comments for recommendations two through five indicated that Zenith did not plan to make the suggested changes. See id. Neither Zenith nor Allendale took any action with regard to any of the recommendations. See tr. at 627-28. Defendants did not request, nor did Allendale provide, a copy of the survey report. See tr. at 557.
Effective June 1, 1991, the parties executed a new agreement (the "second contract") to cover the warehouse risk until June 1, 1992. This contract included terms similar, but not identical, to those of its predecessor. The "Service of Suit Clause (U.S.A.)" and the "non sprinklered" disclosure, for example, were repeated; the "sub all recs" clause, however, was not. The premium rose from $5,000 to $5,500 per annum. See Trial Ex. 8. Allendale did not inform defendants of the survey report's recommendations or of the fact that no action had been taken with regard to those recommendations. See tr. at 321.
On June 15, 1991, the Seclin warehouse was completely destroyed by fire. Undisputed Facts at ¶ 16. On January 29, 1992, defendants wrote Allendale purporting to rescind the second contract in light of, inter alia, Allendale's alleged failure to disclose the outstanding survey report recommendations. See Trial Ex. OOOO; tr. at 257.[2] Defendants then instituted a declaratory judgment action in England seeking recission of the agreement. See tr. at 257; Undisputed Facts at ¶ 25. The English courts refused to issue the requested declaratory judgment in light of the agreement's forum-selection clause. See Trial Ex. 26. Allendale incurred $234,633.99 in litigation expenses in defending this action; $172,360.61 of this amount *282 was paid by defendants pursuant to an order of the English courts. Undisputed Facts at ¶ 30.[3] After making payment to Zenith pursuant to the underlying insurance contract, Allendale demanded indemnification from the defendants under the second contract. See Trial Ex. 23, 24. This suit followed defendants' refusal to pay.

II. Conclusions of Law

A. Defendants' Refusal to Pay the $7 Million Claim
Defendants contend that their performance under the second contract is excused by Allendale's failure to inform them of the recommendations made in the survey report and Zenith's failure to implement these recommendations. Under New York law, a reassured owes to its reinsurer a duty of "uberrimae fidei," a phrase generally translated as "the utmost good faith." In re Liquidation of Union Indemnity Ins. Co., 89 N.Y.2d 94, 106, 651 N.Y.S.2d 383, 674 N.E.2d 313 (1996). The core of this duty "is a basic obligation of a reinsured to disclose to potential reinsurers all `material facts' regarding the original risk of loss, and failure to do so renders a reinsurance agreement voidable or rescindable." Id.; See also Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 278 (2d Cir.1992) ("The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk . . . ."). This doctrine imposes no duty of inquiry upon a reinsurer; rather, the burden is on the reassured to volunteer all material facts. See In re Liquidation of Union Indemnity Ins. Co., 89 N.Y.2d at 107, 651 N.Y.S.2d 383, 674 N.E.2d 313; Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir.1986) ("Since the [reinsured] is in the best position to know of any circumstances material to the risk, [it] must reveal those facts to the underwriter, rather than wait for the underwriter to inquire."); Reliance Ins. Co. v. Certain Member Companies, 886 F.Supp. 1147, 1154 (S.D.N.Y.), aff'd, 99 F.3d 402, 1995 WL 764460 (2d Cir.1995). Moreover, a reinsured "need not possess a specific intent to conceal information from a reinsurer to make a contract voidable . . . an innocent failure to disclose a material fact is sufficient." In re Liquidation of Union Indemnity Ins. Co., 89 N.Y.2d at 107, 651 N.Y.S.2d 383, 674 N.E.2d 313 (internal quotation marks omitted).
A fact is "material" for purposes of the uberrimae fidei doctrine if it "would have either prevented a reinsurer from issuing a policy or prompted a reinsurer to issue it at a higher premium" had it been disclosed before the contract was executed. Id. at 106, 651 N.Y.S.2d 383, 674 N.E.2d 313. Materiality is generally a question of fact,[4] and is determined by consideration of what a reasonable reinsured would have believed to be material to the reinsurer at the time of contracting. See Christiania, 979 F.2d at 278-79.
The non-disclosure at issue here meets this standard. Whatever the effect of the "sub all recs" clause on the validity of the parties' contracts, it surely put Allendale on notice that defendants considered the survey report's recommendationsand their implementationimportant. See Christiania, 979 F.2d at 280 ("Where the insurer specifically inquires as to a fact, the insured is thereby on notice that the insurer considers it material . . . ."). Even plaintiff's expert witness agreed at trial that this was the case.[5]
It is true that the clause was written into the first contract only, and was not included by the defendants six months later. The doctrine of uberrimae fidei, however, *283 would count for very little if a reinsurer not only had to inform its reinsured that it considered desired information material, but had to renew this notice every six months. Such a result would effectively impose on reinsurers a duty of inquiry, despite well-settled precedent to the contrary. See In re Liquidation of Union Indemnity Ins. Co., 89 N.Y.2d at 107, 651 N.Y.S.2d 383, 674 N.E.2d 313; Knight, 804 F.2d at 13; Reliance Ins. Co., 886 F.Supp. at 1154; see also Unigard Security Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1066 (2d Cir.1993) ("Courts should . . . adopt information-forcing default rules based on the good faith the reinsurance market demands.") (emphasis added).
Nor could uberrimae fidei retain significance if a reinsurer's notice of materiality was held to lapse every time a new contract is executed. Were that the case, "materiality" would often be limited to those matters required to be disclosed by specific terms of the contract. This result would clearly frustrate the information-forcing purpose of the doctrine.
Given a sufficient passage of time or a sufficient number of new contracts, of course, a reinsurer's notice that it considers certain information material may become "stale." For instance, if the parties here had for years agreed to renewal contracts on the Seclin warehouse risk and defendants had never again demonstrated an interest in the survey report recommendations, Allendale may have reasonably concluded that defendants no longer considered the subject important. However, it cannot be seriously maintained that this conclusion could be reached a mere six months after defendants had expressed unwillingness to enter the contract without the assurance that all recommendations would be complied with within sixty days of Allendale's receipt of the survey. Given the defendants' insistence on the "sub all recs" clause, the fact that the survey contained recommendations that were never implemented was "material" within the meaning of the uberrimae fidei doctrine.
Attempting to resist this conclusion, Allendale points to the testimony of Stanley Chard, lead underwriter on the Seclin warehouse risk for defendant Excess Insurance Company, who testified at trial as follows:
Q. So, your problem is [that Allendale] never advised you [of the outstanding recommendations]; is that correct?
A. One of the problems.
Q. You don't know what you would have done had they advised you?
A. I can't say what we would have done. It is a difficult question.
Tr. at 430. Unlike Allendale, I do not find this testimony especially probative on the issue of materiality. Mr. Chard's lack of certainty may simply reflect the fact that he does not know whether defendants would have refused to enter into the second contract on any terms, would have done so only upon payment of a larger premium, or would have insisted on further disclosures before deciding. This interpretation is supported by his earlier testimony that he, like every other witness queried on the subject, found the non-disclosure of the outstanding recommendations to be material. See tr. at 330; tr. at 246-47 (testimony of Maurice Charles, deputy claims adjuster for defendant Excess Insurance Company); tr. at 900-01 (testimony of Allendale's expert witness Christian Milton, vice president of the American International Group). Thus, Mr. Chard's "admission" does not alter my conclusion that the existence of outstanding recommendations in the survey report was material.
Allendale also contends that its non-disclosure was immaterial in that the "recommendations" referred to in the "sub all recs" clause were something other than the recommendations made in the survey report. According to Allendale, the "sub all recs" clause referred only to those recommendations required to bring the warehouse to a basic standard of insurability. By contrast, it argues, the recommendations contained in the survey report were meant to raise the warehouse from mere insurability to an exacting "Highly Protected Risk" standard. Because no changes to the warehouse were required to make it merely insurable, Allendale concludes, there were no recommendations within the meaning of the "sub all recs" clauseto disclose.
*284 This argument has only its creativity to commend it. As noted earlier, a non-disclosure is "material" if, at the time of contract formation, a reasonable reinsured would have believed that the reinsurer would refuse to cover the risk or would charge a higher premium if the disclosure were made. See Christiania, 979 F.2d at 278-79. When the second contract was being negotiated prior to June 1, 1991, a reasonable reinsured in Allendale's position would look to clauses required by defendants in the previous contract in identifying information defendants would believe to be material, including the "sub all recs" clause. See id. at 280. Applying the well-established principle that unambiguous contractual terms are understood in their ordinary sense, see Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990), the reinsured would then arrive at the unsurprising conclusion that "all recommendations," as used in the contract, includes, at minimum, all entries in the survey report includes under the heading "Recommendations." What a reasonable reinsured could not doas Allendale apparently didis read the clause to mean "subject to all recommendations necessary to make the warehouse insurable." While this reading may accurately reflect Allendale's definition of the term "recommendations," there is no basis to conclude that defendants shared this highly subjective interpretation.
Of course, the contractual language standing alone is not necessarily dispositive on the issue of materiality: If Allendale had good reason to believe that defendants did not really consider "all" recommendations material, despite the language of the clause, selective disclosure on the subject might have been sufficient. Allendale, however, can point to no such reason. It cites the testimony of Christian Milton, its expert witness, for the proposition that the term "recommendations," as used in the clause and as understood in the insurance industry, refers only to those recommendations relating to housekeeping, maintenance, watch service, and the insured building's physical construction. Mr. Milton, however, did not actually say this: He expressly declined to offer an opinion as to what was meant by the term "recommendations" as used in the clause; moreover, he listed housekeeping, security, maintenance, and construction merely as examples of important areas of concern for surveyors.[6] There is no basis to conclude from this testimony that defendants would not have considered the recommendations in the survey report to be material.
As its last line of defense, Allendale argues that information regarding the survey recommendations could not have been material because, for a variety of reasons, each individual recommendation was immaterial. For instance, Allendale points out that recommendations three, four and five involve the proposed addition of automatic sprinkler protection. See Trial Ex. D1. Because both contracts disclosed that the warehouse was non-sprinklered, it argues, defendants cannot have considered these recommendations material. It is certainly true that defendants consented to cover the warehouse in an unsprinklered state. However, this is not the same thing as consenting to coverage of an unsprinklered warehouse when a professional surveyor has recommended that sprinklers be added. While defendants agreed that sprinkler protection was not necessarily required for reinsurance to be bound, the "sub *285 all recs" clause suggests that they did not agree to coverage without the unqualified approval of a surveyor. Thus, the "non-sprinklered" contractual disclosure does not significantly detract from the materiality of Allendale's failure to disclose the sprinkler-related recommendations.
As to recommendations one, two and six, Allendale argues that these were not material in that the warehouse already had sufficient protection in these areas. This argument is meritless: Materiality is determined with reference to what the reinsurer considers important, not the reinsured. See Christiania, 979 F.2d at 278-79. Having provided Allendale with clear notice that they considered compliance with the survey report recommendations material, defendants were entitled to assume that they would be informed of any non-compliance, even if alternate safeguards had been put in place. Allendale's unilateral decision that the recommendations were overcautious does not ameliorate its failure to disclose those recommendations and Zenith's non-compliance.

B. Defendants' Alleged Violation of the Implied Covenant of Good Faith and Fair Dealing
Allendale's second theory of liability is that defendants breached the second contract's implied covenant of good faith and fair dealing by refusing payment of Allendale's claim without making a reasonable investigation of whether such payment was owed. It is true that an insurer's failure to investigate a claim reasonably can amount to a breach of the implied duty of good faith under New York law. See New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) ("[I]mplicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included. Certainly, a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.") (citations omitted). However, defendants' investigation was reasonable: Their declination letter, for instance, reveals that they were aware of Allendale's failure to disclose the outstanding survey report recommendations when the decision to deny coverage was made. See Trial Ex. OOOO. As I have discussed at some length above, this decision was not only reasonable, but fully warranted. Therefore, defendants did not breach the contract's implied covenant of good faith and fair dealing.

C. Defendants' Alleged Violation of the Forum Selection Clause
Allendale's final claim is that defendants violated the second contract's forum-selection clause by bringing its declaratory judgment action in England rather than the United States. As noted above, this clause states: "It is agreed that in the event of the failure of the [defendants] . . . to pay any amount claimed to be due hereunder, the [defendants], at the request of [Allendale], will submit to the jurisdiction of a court of competent jurisdiction within the United States of America." Trial Ex. 51; tr. at 417. The unquestionable purpose of this clause is to grant Allendale the option of resolving any non-payment claim it has against defendants in the courts of the United States. See Nash v. Board of Educ., Union Free School Dist. No. 13, 38 N.Y.2d 686, 689, 382 N.Y.S.2d 31, 345 N.E.2d 575 (1976) (contracts must be interpreted to effectuate the intent of the parties); Water Energizers Ltd. v. Water Energizers, Inc., 788 F.Supp. 208, 211 (S.D.N.Y.1992) ("There are no magic words . . . that must appear in a contract to create an effective designation of an exclusive forum. Any language that reasonably conveys the parties' intention to select an exclusive forum will do."). Defendants' attempt to win a declaratory judgment on the issue of their liability in England was an opportunistic attempt to evade the effect of the clause. It is true that defendants initiated their suit before Allendale had yet made a formal demand for payment, and thus that the clauseif applied mechanicallydoes not apply. As courts in related contexts have regularly recognized, however, the availability of declaratory judgments should not allow defendants to avoid their forum-selection obligations by casting themselves in the role of plaintiffs. See, e.g., Ontel Products, Inc. v. *286 Project Strategies Corp., 899 F.Supp. 1144, 1150 (S.D.N.Y.1995) (when two related lawsuits are pending, the first suit filed takes precedence unless it is an "improper anticipatory filing"usually a declaratory judgment actioninitiated solely to determine the forum in which a dispute will be heard); see also Jumara v. State Farm Ins. Co., 55 F.3d 873, 880 (3d Cir.1995) (plaintiff's choice of forum is normally given considerable weight in deciding a motion to transfer venue under 28 U.S.C. § 1404; this is not true, however, when plaintiff's choice is an attempt to avoid the effect of an agreed-upon forum selection clause). Thus, defendants have breached the clause, and are liable to Allendale for the still uncompensated expenses it incurred defending the English action. See Laboratory Corp. of America, Inc. v. Upstate Testing Lab., 967 F.Supp. 295 (N.D.Ill.1997) (New York law allows the recovery of damages for breach of forum-selection clause); Fischer v. Bright Bay Lincoln Mercury, Inc., 234 A.D.2d 586, 587, 651 N.Y.S.2d 625 (2d Dept.1996) (contract damages are awarded so as to put the injured party in the position it would have occupied absent the breach).

IV. Conclusion
For the foregoing reasons, I find that Allendale's failure to disclose the existence of outstanding recommendations made as part of the survey report constituted a violation of its duty of utmost good faith. Because defendants were thereby entitled to recission of the parties' contract, no breach of that contract occurred when defendants refused to pay Allendale's claim for payment on the Seclin warehouse loss, and defendants are not liable now for Allendale's $7 million claim. I further find that defendants' investigation into the claim was reasonable, and therefore that defendants did not breach the contract's implied covenant of good faith and fair dealing. However, I find that defendants breached the contract's forum selection clause by bringing suit in England. Allendale is therefore entitled to recover from defendants $62,273.15, its costs related to the English action that have not yet been reimbursed. The clerk of the court is directed to close this case.
SO ORDERED.
NOTES
[1] For a full procedural history of this case, see Allendale Mutual Ins. Co. v. Excess Ins. Co., 970 F.Supp. 265 (S.D.N.Y.), modified following motion for reargument, 992 F.Supp. 271 (S.D.N.Y. 1997).
[2] The other grounds for recission proffered were Allendale's failure to disclose 1) the true loss history at the Seclin warehouse and 2) the fact that the survey report gave the warehouse an overall "poor" rating. See Trial Ex. OOOO. Before trial, defendants suggested that still more non-disclosures were material: 3) the fact that the warehouse's roof was partially composed of fiberglass and plastic, despite the fact it was described as "100% non-combustible," 4) that the total value of insured goods at the warehouse increased during the coverage period, 5) that the reinsured was technically FMI, not Allendale, and 6) that the warehouse was considered by Zenith a "temporary" site. Non-disclosures 3), 4), 5) and 6) were either withdrawn or held to be procedurally barred immediately before trial. See tr. at 3-54.

Because of my resolution of the "sub all recs" non-disclosure issue, I need not address nondisclosures 1) or 2) at length. Had this been otherwise, I would have found, in the particular circumstances of this case, that the "poor" overall rating was material but that the warehouse's loss history was not.
[3] Allendale now claims $62,273.15 as its damages for defendants' breach of the forum-selection clause, on the theory that it represents the difference between these amounts. The actual difference between the figures is $62,273.38.
[4] "[C]lear and substantially uncontradicted" evidence of materiality is a question of law. Mutual Benefit Life Ins. Co. v. Schwartz, 170 A.D.2d 359, 566 N.Y.S.2d 62 (1st Dept.1991).
[5] See tr. at 900-01 (testimony of Christian Milton, vice president of the American International Group):

Q. [W]ould you agree that through [the "sub all recs"] condition [defendants] had put Allendale on notice that compliance with survey recommendations was important?
A. Certainly they would put them on notice that was the fact.
[6] The testimony cited by Allendale reads as follows:

Q. Do you have an opinion as to the type of rec that was expected by the notation . . . which says "sub all recs"? What was meant by the word "rec"?
A. I can't specifically say what was meant by it . . . . From my experience, in underwriting these types of risks what I will say is when a surveyor goes out to look at a premises, he will want to see the general housekeeping is okay, he will want to ensure that the roof is in good condition, he will want to ensurelook at the neighborhood to see whatmost warehouses aren't necessarily located in great neighborhoods. He will want to ensure that the security of the building is taken care of. He may look to seewith warehouses, if you look around just New York City as an example, you will see warehouses with windows that are missing, as an example. He will want to ensure given the values being stored in there that appropriate action has been taken to keep those windows sort of either secured so as to prevent the ingress of rain which could damage obviously merchandise that may be stored in the warehouse.
Tr. at 876-77.